

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-12-2001

# USA v. Spinello

Precedential or Non-Precedential:

Docket 00-3504

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"USA v. Spinello" (2001). *2001 Decisions.* Paper 209.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/209

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 11, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3504

UNITED STATES OF AMERICA

v.

ROBERT SPINELLO,
        Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
D.C. Crim. No. 99-cr-00536
District Judge: The Honorable Joseph A. Greenaway, Jr.

Argued: July 24, 2001

Before: ROTH, BARRY, and AMBRO, Circuit Judges

(Opinion Filed: September 11, 2001)

        Mark A. Berman, Esq. (Argued)
        Lawrence S. Lustberg, Esq.
        Gibbons, Del Deo, Dolan, Griffinger
         & Vecchione
        One Riverfront Plaza
        Newark, NJ 07102-5497

        Attorneys for Appellant

          Robert J. Cleary, Esq. (Argued)
          United States Attorney
          George S. Leone, Esq.
          Asst. United States Attorney
          Office of the United States Attorney
          970 Broad Street, Room 700
          Newark, NJ 07102

          Attorneys for Appellees

OPINION OF THE COURT

BARRY, Circuit Judge:

We are principally called upon in this appeal to decide two issues of first impression in this Court. The first is one in a long line of post-Lopez[1] challenges to federal statutes on Commerce Clause grounds, this one to the federal bank robbery statute, 18 U.S.C. S 2113. The second asks that we determine whether a recent amendment to the United States Sentencing Guidelines which, in the words of the Sentencing Commission, "defines and describes aberrant behavior" was a mere clarification or a substantive change in the law. We reject the challenge to S 2113 and conclude that the amendment at issue effected a substantive change and, thus, cannot be applied retroactively. Accordingly, we will affirm.

What has brought us to this point is uncomplicated and not in dispute. Shortly before 3:00 p.m. on January 13, 1999, appellant Robert Spinello, an officer with the Edison, New Jersey, Police Department, walked into the First Savings Bank in Edison. He approached a bank teller, flashed the service pistol that he had concealed in a newspaper, placed a plastic bag on the counter, and demanded of the teller, "[G]ive me all your fifty and [one] hundred straps." In response to the teller's statement that she had only one strap each of fifty and one-hundred dollar bills, Spinello told the teller to "keep on going," and then waited as she filled the plastic bag with $3,500 in the

_____

1. United States v. Lopez, 514 U.S. 549 (1995).

following denominations: $1,000 in one hundred dollar bills, $1,000 in fifty dollar bills, $1,000 in twenty dollar bills, and $500 in ten dollar bills. After the bag was filled, Spinello "told [the teller] to count to ten, and then started to walk away." After exiting the bank, Spinello drove to his brother's condominium and stashed the $3,500 in a living room table. Spinello put the money straps and the hat he wore during the robbery into a garbage can, hung his jacket in a closet, and proceeded to the Edison Police Headquarters, where he arrived at approximately 3:30 p.m. for his 3:50 p.m. tour of duty.

Later that same day, Spinello, who had been followed out of the bank by a bank customer who memorized his license plate number, was told by his superiors to go to the bank for questioning by the FBI. After his interview with the FBI, Spinello submitted to a "show-up" identification procedure where he was positively identified by the victim teller. A subsequent search of the Edison condominium revealed $3,500 in the same denominations as had been stolen from the bank. Spinello was arrested.

On September 16, 1999, Spinello was charged by a federal grand jury in a three-count indictment with: (1) bank robbery, in violation of 18 U.S.C. SS 2113(a) and 2; (2) bank robbery with a dangerous weapon, in violation of SS 2113(d) and 2; and (3) use of a firearm in relation to a crime of violence, in violation of SS 924(c) and 2. Prior to trial, Spinello moved to dismiss the indictment, alleging that the bank robbery statute itself, or the application of the bank robbery to the facts of his case, exceeded Congress's power under the Commerce Clause. The District Court denied Spinello's motion. See United States v. Spinello, 95 F. Supp. 2d 242 (D.N.J. 2000). As a result, Spinello went to trial.

On May 17, 2000, the jury convicted Spinello on all three counts of the indictment. Prior to his sentencing, Spinello admitted that he had, in fact, robbed the First Savings Bank and submitted a memorandum that set forth certain facts pertinent to sentencing -- in particular, facts by which he hoped to rebut an obstruction of justice enhancement and support, on various grounds, his motion for a downward departure. Two of those grounds are

3

reraised on appeal -- the aberrational nature of his behavior and the "extraordinary" anguish and remorse he was suffering because of the prosecution of his brother, Michael, for perjury allegedly committed by him in his defense of Spinello. The District Court denied the motion for a downward departure and sentenced Spinello to an aggregate term of 111 months in prison.

Spinello filed a timely notice of appeal. We have jurisdiction pursuant to 28 U.S.C. S 1291 and 18 U.S.C. S 3742.

I.

The Commerce Clause and 18 U.S.C. S 2113

We turn, first, to Spinello's argument that in enacting 18 U.S.C. S 2113 -- the federal statute criminalizing bank robbery -- Congress exceeded its power under the Commerce Clause,2 an argument which one of our sister circuits has somewhat pithily described as "popular with criminal defendants these days." United States v. Watts, 256 F.3d 630, 631 (7th Cir. 2001). Relying on United States v. Lopez, 514 U.S. 549 (1995), Spinello claims that, as an intrastate activity, bank robbery -- or, at least, his bank robbery -- does not have a "substantial effect" upon interstate commerce and, thus, S 2113 must fall. "Our review of the statute's constitutionality is plenary, though we must respect Congress's ample discretion to determine the appropriate exercise of its Commerce Clause authority." United States v. Rodia, 194 F.3d 465, 469 (3d Cir. 1999), cert. denied, 120 S.Ct. 2008 (2000). Indeed, there is a "presumption of constitutionality." United States v. Morrison, 529 U.S. 598, 607 (2000). The precise question we must answer is this: Did Congress have a rational basis for concluding that bank robbery substantially affects interstate commerce? The answer is a ringing "Yes."

_____

2. The Constitution of the United States provides: "The Congress shall have power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, S 8, cl. 3.

4

In Lopez, the Supreme Court struck down the Gun-Free School Zones Act of 1990, 18 U.S.C. S 922(q), because the Act "neither regulate[d] a commercial activity nor contain[ed] a requirement that possession be connected in any way to interstate commerce." Lopez, 514 U.S. at 551. Lopez was significant not so much because, in terms of its analysis of the commerce power, it plowed new ground. Rather, it was significant -- and jumped on by defendants -- because it was the first case in more than half a century in which the Supreme Court invalidated an act of Congress solely because Congress had exceeded its authority under the Commerce Clause; indeed, S 922(q) bore virtually no relation to interstate commerce. Although, since Lopez, we have upheld numerous federal criminal statutes against challenges that they were impermissible exercise of Congress's commerce power,[3] this is our first occasion to consider that challenge when addressed to S 2113.

It is by now familiar teaching, by virtue of Lopez and its progeny and lower court decisions too numerous to count much less mention, that Congress may regulate under its commerce power in three broad categories. First,"Congress may regulate the use of the channels of interstate commerce." Second, "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." And, third, "Congress' commerce authority includes the power to regulate those activities having a substantial relation to

_____

3. See, e.g., United States v. Gregg, 226 F.3d 253 (3d Cir. 2000), cert. denied, 121 S.Ct. 1600 (2001) (upholding Freedom of Access to Clinic Entrances Act); United States v. Rodia, 194 F.3d 465 (3d Cir. 1999), cert. denied, 529 U.S. 1131 (2000) (upholding federal statute prohibiting intrastate possession of child pornography); United States v. Parker, 108 F.3d 28 (3d Cir. 1997), cert. denied, 522 U.S. 837 (1997)(upholding Child Support Recovery Act, which criminalizes failure to pay past due support obligations); United States v. Rybar, 103 F.3d 273 (3d Cir. 1996), cert. denied, 522 U.S. 807 (1997)(upholding federal statute criminalizing possession of a machine gun); United States v. Orozco, 98 F.3d 105 (3d Cir. 1996)(upholding Drug-Free School Zones Act); United States v. Gateward, 84 F.3d 670 (3d Cir. 1996) (upholding federal statute barring felons from possessing firearms); United States v. Bishop, 66 F.3d 569 (3d Cir. 1995) (upholding federal carjacking statute).

interstate commerce" -- activities that "substantially affect interstate commerce." Lopez, 514 U.S. at 558-59. Because the Gun-Free School Zones Act at issue in Lopez did not involve any channels or instrumentalities of interstate commerce, it could only have survived, if it were to have survived, under the "substantially affects" category, and that was the category on which the Court focused.

With reference to the third category, under Lopez a federal criminal statute that includes a jurisdictional element which would ensure, through case-by-case inquiry, that the prohibited conduct substantially affects interstate commerce would, without more, pass muster as would a statute reaching intrastate economic activity that substantially affects interstate commerce. See id. at 559-61. It is, thus, appropriate to consider, first, whether there is in S 2113 a jurisdictional element which "adequately performs the function of guaranteeing that the final product regulated substantially affects interstate commerce." Rodia, 194 F.3d at 473. If it does, as it did not in Rodia, there would be no necessity to perform the inherently imprecise analysis of S 2113's constitutionality under the remaining Lopez considerations -- and more about those considerations later -- to determine if intrastate bank robbery substantially affects interstate commerce.

A jurisdictional element, as that phrase has been used in and after Lopez, "refers to a provision in a federal statute that requires the government to establish specific facts justifying the exercise of federal jurisdiction in connection with any individual application of the statute." Rodia, 194 F.3d at 471.4 Spinello correctly notes that "[t]he mere presence of a jurisdictional element . . . does not in and of itself insulate a statute from judicial scrutiny under the Commerce Clause, or render it per se constitutional. To the
_____

4. A jurisdictional element is not, however, required, at least where the federal statute under review regulates economic activity -- and, as we will discuss, S 2113 does just that. "The law, made clear in Lopez, is that
where Congress is not regulating economic activity, or instrumentalities in interstate commerce, the concept of federalism requires a jurisdictional element linking the criminal act to interstate commerce." United States v. Wilson, 73 F.3d 675, 694, n.7 (7th Cir. 1995) (Coffee, J.,
dissenting).

6

contrary, courts must inquire further to determine whether the jurisdictional element has the requisite nexus with interstate commerce," i.e. whether that element "limits the statute to items that have an explicit connection with, or effect upon, interstate commerce." United States v. Bishop, 66 F.3d 569, 585 (3d Cir. 1995).

It requires no great mental gymnastics to conclude that a more than adequate jurisdictional element is present in S 2113. Section 2113, unlike S 922(q), contains an express jurisdictional element with the requisite limitation because a covered bank is defined, in pertinent part, as a member of the Federal Reserve System or a banking institution organized under the laws of the United States or an institution whose deposits are insured by the Federal Deposit Insurance Corporation. See 18 U.S.C.S 2113(f). The Ninth Circuit, in the course of rejecting the same lack of nexus argument raised here, concluded that it was sufficient that S 2113 "contains jurisdictional language that requires the prosecutor to establish a connection to interstate commerce because the statute's coverage is limited to banks that are members of the Federal Reserve System or insured by the FDIC." United States v. Harris, 108 F.3d 1107, 1109 (9th Cir. 1997). See also United States v. Fryer, 896 F. Supp. 763, 764-65 (N.D. Ill. 1995).

The "case-by-case inquiry" Lopez requires leaves no doubt not only that the jurisdictional element inS 2113 ensures that bank robbery substantially affects interstate commerce but that, as the jury found, the First Savings Bank was within the statute's coverage because it was insured by the FDIC. But even if the jurisdictional element in S 2113 had been found wanting, the statute would, nonetheless, survive a Commerce Clause challenge because intrastate bank robbery "substantially affects" interstate commerce.

The Lopez Court, in setting forth the analytical framework for determining whether a regulated activity substantially affects interstate commerce, specified four considerations: (1) whether the statute is one "that by its terms has nothing to do with `commerce' or any sort of economic enterprise, however broadly one might define those terms," Lopez, 514 U.S. at 561; (2) whether, as we

7

have already discussed, the statute is one that contains an "express jurisdictional element which might limit its reach to a discrete set of [intrastate activities] that additionally have an explicit connection with or effect on interstate commerce," id. at 562; (3) whether the statute or "its legislative history contain[s] express congressional findings regarding the effects upon interstate commerce" of the regulated intrastate activity, id.; and (4) whether the link between the regulated intrastate activity and the effect on interstate commerce is too attenuated, id. at 563–67. The Court concluded: "These are not precise formulations, and in the nature of things they cannot be. But we think they point the way to a correct decision in this case. The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." Id. at 567.

Clearly, for starters, the robbery of a bank, unlike the intrastate possession of a gun within a school zone which Congress attempted to regulate in S 922(q), is an "economic" activity almost by definition and is certainly an economic activity within the broad definition that we adopted in Bishop. In Bishop, we upheld the federal carjacking statute and explained that carjacking was an "economic" activity: "When a criminal points a gun at a victim and takes his or her car, the criminal has made an economic gain and the victim has suffered an undeniable and substantial loss. Replicated 15,000 or 20,000 times per year, the economic effects are indeed profound." Bishop, 66 F.3d at 581; see also United States v. Gregg, 226 F.3d 253, 262 (3d Cir. 2000) (finding that the misconduct regulated by the Freedom of Access to Clinic Entrances Act (FACE), which barred abortion protestors from blocking entrances to reproductive health care facilities, had "an effect which is, at its essence, economic" since it interfered with the commercial transaction of a potential abortion). A bank robber is obviously motivated by his or her own immediate economic gain -- money is, of course, "economic" -- and, wholly aside from whether FDIC insurance will ultimately kick in, the victim bank and its depositors suffer immediate economic losses as well as the disruption to their respective abilities to engage in commerce, interstate or otherwise, by

8

such activities as lending and purchasing assets. Thus, it cannot be said that S 2113 "has nothing to do with `commerce' or any sort of economic enterprise, however, broadly one might define those terms." Lopez , 514 U.S. at 561.

With regard to whether the link between the regulated intrastate activity -- here, bank robbery -- and the effect on interstate commerce is too attenuated -- a question we have already answered in the negative in the course of our discussion of the jurisdictional element which, we found, guaranteed that nexus -- we stress that S 2113 is not plagued by the exaggerated "but-for" causation that brought a death knell, first, to the statute in Lopez, where the Court rejected the speculative effects of school-zone possession of guns on interstate commerce and, then, to the statute in United States v. Morrison, 529 U.S. 598 (2000), where the Court struck down the civil remedy provision of the Violence Against Women Act (VAWA) after rejecting the similarly-speculative effects of gender-motivated violence on interstate commerce. Unlike the activities regulated in S 922(q) and the VAWA, and separate and apart from the existence or lack thereof of a jurisdictional element, bank robbery has immediate, non-collateral, non-speculative effects on interstate commerce. As the government puts it:

> Robberies of banks insured by the FDIC, in the aggregate, clearly have a substantial affect on interstate commerce. The deposits of the banks are often the assets of companies, other entities, and individuals, who are engaged in interstate commerce, and who depend on these assets to conduct their interstate business. Individual banks themselves are involved in interstate commerce in their deposits and other financial services, and are integral, indispensable parts of a large complicated financial web that is employed every day to move money across the nation and around the globe. Additionally, banks lend their deposits and other funds to companies, other entities, and individuals so that they may participate in interstate financial and business transactions. The banks' assets are constantly moving in and out of

9

interstate commerce. In fact, interstate commerce would be crippled without the funds of banks insured by the FDIC. Robberies of these banks threaten the uninterrupted operation of these financial institutions and the confidence the public has in them.

Appellee's Br. at 33-34. Indeed, long ago, Mr. Justice Holmes observed, in a case involving a fraud on a state bank which was a member of the Federal Reserve System, "[E]very fraud like the one before us weakens the member bank and therefore weakens the System." Westfall v. United States, 274 U.S. 256, 259 (1927). Almost as long ago, Congress itself recognized the connection between interstate commerce and the federally-insured status of banks when it concluded that interstate commerce would be facilitated by a system of federal insurance for the deposits of banks that preserves the "sound, effective, and uninterrupted operation of the banking system." See Banking Act of 1935, ch. 614, 49 Stat. 684 (1935). Thus, unlike the farfetched "effects" suggested in Lopez and Morrison, there is no need to "pile inference upon inference" to manufacture an effect of this intrastate criminal activity upon interstate commerce. See Lopez, 514 U.S. at 567.

Finally, as the District Court recognized with reference to the remaining Lopez consideration, "where the connection to interstate commerce is plainly apparent," as it is here, "the absence of detailed, numeric [congressional] findings [regarding the effects of bank robbery on interstate commerce] is not dispositive." Spinello , 95 F. Supp. 2d at 247. The legislative history is far from silent, however, and it is quite clear from that history that when S 2113 was originally enacted in 1934, it was in response to the problem of " `gangsters who operate habitually from one State to another in robbing banks.' " Bell v. United States, 462 U.S. 356, 361 (1983), quoting S.Rep. No. 537, 73d Cong., 2d Sess. 1 (1934), itself quoting a Justice Department memorandum. The House Report quoted the same memorandum: "From all sections of this country Federal relief has been requested. It is asserted that these criminals are sufficiently powerful and well equipped to defy local police, and to flee beyond the borders of the State before adequate focus can be organized to resist and

capture these bandits." H.R. Rep. No. 1461, 73d Cong., 2d Sess., 2 (1934). As we observed in Bishop,"[I]f a criminal activity is rationally believed to be one of the conduits of a nationwide and international pipeline of illegal activity, Congress may justifiably step in and regulate that activity although it is wholly intrastate." 66 F.3d at 585.

It is important to note that the decisions in Lopez and Morrison were largely driven by the principle that there must remain "a distinction between what is truly national and what is truly local." Lopez, 514 U.S. at 567–68. In this regard, we find it eminently appropriate that, in rejecting Spinello's challenge, the District Court noted that"federal law has prohibited bank robberies for 65 years. Thus, S 2113 neither invades an area of long–standing exclusive state regulation nor upsets the traditional balance between the states and the federal government." Spinello, 95 F. Supp. 2d at 248 n.9; see also Rodia, 194 F.3d at 479 (pointing to the over twenty–year history of federal regulation of child pornography).

Those courts of appeals that have thus far addressed in reported opinions Lopez challenges to S 2113 have given those challenges much shorter shrift than we have given them, and have uniformly rejected them.[5]  The Seventh Circuit, in the most recent rejection, did not reach the issue of whether the robbery of an intrastate bank substantially affects interstate commerce because it found that"at the very least, the FDIC–insured financial institutions are instrumentalities and channels of interstate commerce and their protection from robbery is well within Congress's Commerce Clause power." Watts, 256 F.3d at 634. See also Harris, 108 F.3d at 1109 (banks that are members of the Federal Reserve System or insured by the FDIC are instrumentalities and channels of interstate commerce and

_____

5. We note that, in unreported opinions, the Fourth and Eighth Circuits have also rejected Lopez challenges to S 2113, and have similarly given those challenges short shrift. See United States v. Kluver, No. 99–1848, 2000 WL 1705073 (8th Cir. Nov. 15, 2000)(the requirement that the victim bank be federally insured provided the necessary connection to interstate commerce); United States v. Walker , No. 95–5223, 1996 WL 414302 at *2 (4th Cir. July 25, 1996)(S 2113 is a valid exercise of Congress's Commerce Clause power).

11

their regulation is well within Congress's Commerce Clause power). The only other courts which have, to date, considered the issue in reported opinions have been even more succinct. See Fryer, 896 F. Supp. at 764-65 (it is "crystal clear" by the definitions of the included federal institutions that the crime of bank robbery underS 2113(a) and (d) is "unquestionably well within the United States' commerce power"). An earlier Seventh Circuit case described the argument that S 2113 exceeds Congress's powers under the Commerce Clause in one word, with no further discussion required: "untenable." United States v. Wicks, 132 F.3d 383, 390 (7th Cir. 1997).

Given our disposition that the activity of bank robbery substantially affects interstate commerce, we need not consider, much less decide, whether banks, as defined in S 2113(f), are channels and/or instrumentalities of interstate commerce, although such a conclusion would seem logical given that banks are the sources and the repositories of the very fuel of our complex interstate (indeed, global) economy. Banks, although static and incapable of themselves moving in interstate commerce, are integral to the web of interstate commercial activity that permeates our economy today and, as described by the government, are "the conduit for the primary factor in commerce -- money -- and the channel through which vast amounts of interstate commerce are conducted." See Spinello, 95 F. Supp. 2d at 249.6 Moreover, as the Watts Court explained:

> FDIC-insured banks are fundamental to the conduct of interstate commerce. Congress created the FDIC to "keep open the channels of trade and commercial exchange." Weir v. United States, 92 F.2d 634, 636 (7th Cir. 1937) . . . [T]he government insurance is federally

_____

6. The District Court found the government's argument that S 2113 is a legitimate regulation of a channel or instrumentality of interstate commerce to be "compelling" and "strongly supported by the role banks play in facilitating, and indeed, permitting the flow of interstate commerce . . . ." Spinello, 95 F. Supp. 2d at 249, n.11. Because, however, it had decided the issue under the "substantially affects" category of commerce power, it, as we, did not need to decide the issue under the channels or instrumentalities categories.

12

> administered, federal officials periodically examine the accounts, and the reports sent to the FDIC deal with money that has been deposited from many sources, including those outside the state." United States v. Peay, 972 F.2d 71, 75 (4th Cir. 1992). Robberies of FDIC-insured banks thus have an interstate economic effect . . . Accordingly, at the very least, the FDIC-insured financial institutions are instrumentalities and channels of interstate commerce . . . .

Watts, 256 F.3d at 633-34.

We find that 18 U.S.C. S 2113 avoids the infirmities that doomed the statutes at issue in Lopez and Morrison. Bank robbery is an economic activity that, with or without repetition elsewhere, substantially affects interstate commerce and, thus, is an activity that Congress was well within its rights to criminalize pursuant to its power under the Commerce Clause. There was simply no federal overkill here, and we reject Spinello's challenge to the constitutionality of S 2113.7

_____

7. Spinello suggests something akin to an "as applied" challenge as well. He argues that because bank robbery is a noncommercial activity (a proposition it should by now be quite clear we reject), the government was required -- but failed -- to prove that his offense -- $3,500 from a local branch bank -- had a "substantial effect' upon interstate commerce. Citing United States v. McGuire, 178 F.3d 203 (3d Cir. 1999), he claims that each non-commercial intrastate offense predicated upon Commerce Clause powers must be shown to have its own "substantial effect" upon interstate commerce in order to be a constitutional exercise of federal criminal jurisdiction. See McGuire , 178 F.3d at 211-12 (reversing the defendant's conviction for blowing up his mother's car where the only evidence in support of a jurisdictional link was an orange juice container that was fortuitously in the car at the time of the explosion and happened to have moved in interstate commerce). McGuire stands for the unremarkable proposition that the evidence of a connection to interstate commerce may be too trivial or attenuated to support a conviction. Moreover, the McGuire Court was explicit that it was not saying that the government is required to establish that each particular use must have a substantial effect on interstate commerce but only that the evidence presented in that case was not sufficient to support a conviction. McGuire, 178 F.3d at 212, n.10. And, of course, Lopez itself was quite clear that where the regulatory statute bears a substantial relation to commerce, as clearly S 2113 does, the de minimus character of particular instances is of no consequence. Lopez, 514 U.S. at 558.

13

II.

       5K2.20 -- The Aberrant Behavior Guideline

Spinello argues, next, that the District Court's reliance on the legal standard enunciated in United States v. Marcello, 13 F.3d 752, 761 (3d Cir. 1994), in its denial of his motion for a downward departure based on "aberrant behavior," was erroneous. Under Marcello, aberrant behavior "must involve a lack of planning; it must be a single act that is spontaneous and thoughtless, and no consideration is given to whether the defendant is a first time offender." Marcello, 13 F.3d at 761. At sentencing, Spinello recognized that Marcello was circuit precedent which the District Court was obliged to apply. However, effective November 1, 2000, subsequent to his sentencing, the Sentencing Commission amended the Guidelines via Amendment 603 to add S 5K2.20, which defines "aberrant behavior" in a manner different from Marcello, to wit: " `Aberrant behavior' means a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. S 5K2.20, Comment., n.1. 8 Spinello seeks a remand to give the District Court the opportunity to consider S 5K2.20 and, hopefully, to resentence him to a lower term. Because Spinello contends that the addition of

_____

8. S 5K2.20 itself provides, under the heading "Aberrant Behavior (Policy Statement)":

      A sentence below the applicable guideline range may be warranted
      in an extraordinary case if the defendant's criminal conduct
      constituted aberrant behavior. However, the court may not depart
      below the guideline range on this basis if (1) the offense involved
      serious bodily injury or death; (2) the defendant discharged a
      firearm or otherwise used a firearm or a dangerous weapon; (3) the
      instant offense of conviction is a serious drug trafficking
offense; (4)
      the defendant has more than one criminal history point, as
      determined under Chapter Four (Criminal History and Criminal
      Livelihood); or (5) the defendant has a prior federal, or state,
felony
      conviction, regardless of whether the conviction is countable under
      Chapter Four.

U.S.S.G. S 5K2.20.

14

S 5K2.20 demonstrates that the District Court committed legal error in applying Marcello, we have jurisdiction to consider this claim. Our review is plenary. See United States v. Paster, 173 F.3d 206, 212 (3d Cir. 1999).

The remand that Spinello seeks as a result of the conflict between Marcello and S 5K2.20 is only possible if that guideline section can be applied retroactively. Because S 5K2.20 is not listed in S 1B1.10(c) for automatic retroactive application, the question before us is whether S 5K2.20 is a mere "clarification" of the law that merits retroactive application to a defendant on direct appeal or a "substantive change" to the Guidelines that does not. See United States v. Marmolejos, 140 F.3d 488, 491 (3d Cir. 1998); see also U.S.S.G. S 1B1.11(b)(2) ("[T]he court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes."). In Marmolejos, we recognized "the established principle that a post-sentencing amendment to a sentencing guideline or its comments should be given effect if it `clarifies' the guideline or comment in place at the time of sentencing," while also noting that if an "amendment effects a substantive change in the law, the defendant does not reap the benefit of the new provision." Id. at 491 (emphasis added).

We find that Amendment 603, which added S 5K2.20, worked a substantive change to the Guidelines rather than a mere clarification of the Guidelines. In Marmolejos, we acknowledged that there was no bright-line test for ascertaining whether an amendment was a clarification or a substantive change. We stressed, however, that our point of reference was "the guideline or comment in place at the time of sentencing," Id. at 490, and that the important factors to consider with respect to that point of reference were (1) whether, as a matter of construction, that point of reference was consistent with the amended manual, (2) the purpose and effect of the enabling amendment, and (3) the language of the amendment itself. See id. at 491 (citations omitted). We shall address each of these factors in turn with respect to S 5K2.20 and Amendment 603-- the amendment that put into place that section of the Guidelines.

15

First, we concern ourselves with matters of general construction. Prior to the addition of S 5K2.20, the only identifiable primary source for the secondary case law that had developed the notion of aberrant behavior departures was Chapter One, Part A, Subpart 4(d) of the Guidelines. Significantly, it was there expressly stated that"[t]he Commission, of course, has not dealt with the single acts of aberrant behavior that still may justify probation at higher offense levels through departures." U.S.S.G. Ch. 1, Pt. A, 4(d) (emphasis added). The Commission's express acknowledgment that it had not, prior to Amendment 603, decided what to do about aberrant behavior departures suggests that, as a matter of construction, any subsequent guideline that issued on that subject would not merely be providing some additional guidance or clarification from the Commission regarding a concept that it had unsuccessfully attempted to explain in the past. Rather, that acknowledgment demonstrates that any subsequent guideline that issued on that subject would constitute the Commission's first impression and announcement of the necessary grounds for such a departure and, thus, effect a substantive change as opposed to a clarification. Stated somewhat differently, it cannot be seriously maintained that an amendment that creates an entirely new guideline is a mere clarifying amendment; the Commission cannot clarify a position where there was no prior position.

Next, with respect to the stated purpose and effect of Amendment 603, we note that this amendment added S 5K2.20 to the Guidelines to "respond[ ] to a circuit conflict regarding whether, for purposes of downward departure from the guideline range, a `single act of aberrant behavior' (Chapter One, Part A, Subpart 4(d)) includes multiple acts occurring over a period of time." See U.S.S.G. App. C, amend. 603 (Reason for Amendment). Significantly, Amendment 603 does not indicate that its purpose is to clarify its position or the Guidelines approach to aberrant behavior departures. While we noted in United States v. Diaz, 245 F.3d 294, 304 (3d Cir. 2001), that the presence or absence of the words "clarify" or "clarifying" does not alone determine the retroactivity of an amendment, we also noted that "it is our own interpretation of the pre-amendment guidelines that determines whether the

16

Amendment clarified that interpretation or substantively changed it." Id. at 304 (emphasis added). In this regard, because there was no pre-amendment guideline that even tangentially addressed an aberrant behavior departure in a manner that resembles that which S 5K2.20 now incorporates, we consider it to be of some significance that the Commission did not indicate that the Amendment was designed to clarify some previously-held position. [9] Indeed, the absence of any such indication supports our conclusion that Amendment 603 and S 5K2.20 set forth the Commission's first statement of what would -- or could -- constitute the grounds for an aberrant behavior departure. Parenthetically, we also find significant one of the professed effects of Amendment 603 -- the incorporation of specific characteristics for offense conduct that makes one eligible for an aberrant behavior departure. See U.S.S.G. App. C, amend. 603 (Reason for Amendment). The fact that the Commission acknowledges that it "chose" these specific characteristics from case law and public comment again confirms to us that the Commission was formulating a new position as opposed to clarifying an existing one. See id.

Finally, the language of the Amendment itself and, most particularly, two phrases therein, also prompts the conclusion that what was afoot was a substantive change to the Guidelines. First, we note that the Amendment, by its very terms, "defines and describes `aberrant behavior' " and "creates a new policy statement and accompanying commentary." See id. Obviously, because these words are suggestive of more activity on the part of the Commission than the words "explains", "clarifies," or "simplifies" would connote and because there was no prior guideline on aberrant behavior, we find that they suggest a substantive change in the law. Our conclusion is reinforced by the fact that Amendment 603 was, admittedly, a "compromise amendment." See id. Again, the Commission's intention to "compromise" between two very different circuit views when giving meaning to the phrase "aberrant behavior" evidences

_____

9. We find it interesting that in seven other amendments to the Guidelines that also became effective on November 1, 2000, the Commission specifically used the word "clarify." See, e.g., U.S.S.G. App. C, amends. 577, 579, 581, 591, 598, 599, and 600.

17

the fact that it merely responded to external sources and created a new guideline as opposed to reflecting internally upon what aberrant behavior was always intended to mean. The Tenth Circuit –– the only other circuit court to date to consider the issue –– recently came to the same conclusion:

> It is clear to us that the Commission viewed S 5K2.20 as a "substantive" change. Section 5K2.20 adds an entirely new section to the Guidelines––new text and new commentary. It "alter[ed] the controlling pre-amendment interpretation" of "aberrant behavior" in all the federal Courts of Appeals, since it rejected in part both the majority and minority rules on the issue. Consequently, we conclude that S 5K2.20 is "substantive" and, as such, off-limits for purposes of our review of Alvarez's case.

United States v. Alvarez-Pineda, 2001 WL 876784, at *5 (10th Cir. Aug. 3, 2001).

In sum, the Commission has not in any way indicated that its current definition of aberrant behavior is precisely what it meant to say (but neglected to) all along. We hold that S 5K2.20 was a substantive change to the Sentencing Guidelines and cannot be applied retroactively to Spinello.10

III.

Monaco Challenge Based on an "Extraordinary" Family Situation

Spinello focuses, finally, on whether the District Court relied on an erroneous legal standard in denying his motion for a downward departure due to an "extraordinary situation" which he analogizes to that which warranted a departure in United States v. Monaco, 23 F.3d 793 (1994), where a father had unwittingly involved his son in a crime. "[W]e have jurisdiction to decide whether a sentencing court

_____

10. Given this disposition, we need not reach the question of whether, had we decided the issue differently, the commentary and one or more of the various exclusions to S 5K2.20 would have precluded the application of the guideline to Spinello.

18

erred legally when not making a requested downward departure, but we cannot hear a challenge to the merits of a sentencing court's discretionary decision not to depart downward from the Guidelines." United States v. Georgiadis, 933 F.2d 1219, 1221 (3d Cir. 1991).

Spinello contends that the District Court ruled as a matter of law that it lacked the authority to grant a departure because of its belief that the basis for departure in Monaco was limited to the "special relationship that fathers have with their sons" where, here, Spinello was invoking his relationship with his brother, Michael, and the anguish he felt over having caused his brother to be indicted and tried for perjury.11 Spinello claims that we have jurisdiction to review his claim that the District Court's narrow reading of Monaco was erroneous.

While the Court did, in fact, note that the absence of a father-son relationship was a ground for its ruling, it did not say that it was the only ground. Rather, the Court stated that it was "not convinced that even if what happened in Monaco [a conviction of a relative] happens here, that Mr. Robert Spinello might suffer the greater moral anguish and remorse than is typical." We consider the District Court's statement to be a finding on the merits that, wholly aside from its belief that the application of a Monaco departure was limited to father-son or even parent-child relationships, Spinello failed to show that his anguish and remorse rose to a level warranting relief. Accordingly, we lack jurisdiction to consider the District Court's discretionary decision to deny the motion for a downward departure. United States v. Nathan, 188 F.3d 190 (3d Cir. 1999).

_____

11. Shortly after Robert Spinello was convicted, Michael Spinello was charged with perjury in connection with his testimony before the grand jury and at his brother's trial. The perjury charges related to Michael's contention that the $3,500 found in his living room table was the proceeds from a November 8, 1998 gambling excursion. Subsequent to Robert's sentencing, Michael was acquitted after Robert testified that, all
unbeknownst to Michael, he had removed $3,500 from the table on the same day that he later robbed the bank and that his act of "replacing" the gambling money with the robbery loot caused Michael to actually believe that his testimony at Robert's trial was truthful.

IV.

Conclusion

For the reasons stated above, we will affirm the judgment of conviction and sentence.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit