In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-1443

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL TURNER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 694—**David H. Coar**, *Judge.*

ARGUED JUNE 7, 2002—DECIDED AUGUST 20, 2002

Before BAUER, POSNER and RIPPLE, *Circuit Judges.*

BAUER, *Circuit Judge.* Michael Turner embezzled a significant amount of money from his employer, Allstate Insurance Company.[1] Turner was a field claims adjuster for Allstate, and he worked out of his home in suburban Northeast Illinois. As part of his duties as an adjuster, Turner was authorized to write settlement checks on be-

---

[1] Allstate Insurance Company is an Illinois corporation and is a subsidiary of Allstate Corporation, a Delaware corporation and holding company with subsidiaries involved nationally in insurance as well as financial services. Allstate Insurance Company has its principal place of business in Northbrook, Illinois.

half of Allstate. Turner wrote eighteen company checks payable to his own order and deposited the checks in his personal bank account.[2] The government indicted Turner on five counts of embezzlement, and the other thirteen uncharged checks were considered during sentencing.

In this appeal Michael Turner argues that 18 U.S.C. § 1033 is unconstitutional as Congress has exceeded its authority to legislate under the Commerce Clause. First, Turner asserts that the district court erred in classifying the statute as regulating instrumentalities or things in interstate commerce. Second, Turner avers that neither he nor Allstate Insurance Company are instrumentalities or things in interstate commerce and that his actions were wholly intrastate. Finally, Turner argues that, in the alternative, his activity is only tangentially related to and did not have a substantial affect on interstate commerce. Hence, Turner asserts that Congress cannot regulate embezzlement in a small locality any more than it can regulate shoplifting in Northbrook, Illinois. He asserts that there must be limits on Congress' power because nearly every individual's day-to-day mundane commercial activities, such as shopping at the local grocery store, may, in some way, affect a company which is involved in interstate commerce. For the reasons that follow, we find that 18 U.S.C. § 1033 does not exceed Congress' power under the Constitution to regulate commerce "among the several States". U.S. CONST. Art. I, § 8, cl. 3.

---

[2] Turner admitted that he was not authorized to deposit the checks into his account and that by doing so he committed a crime. Turner could have been charged under any number of Illinois statutes relating to theft or deception. *See* 720 ILCS 5/16-1, 5/17-1.

## BACKGROUND

Initially, Turner moved to dismiss the indictment, arguing Congress had exceeded its authority under the Commerce Clause by enacting 18 U.S.C. § 1033(b)(1)(A). The district court denied the motion, and Turner decided to plead guilty, reserving the right to appeal the Commerce Clause issue. The district court sentenced Turner to five months confinement (recommending the sentence be served in a half-way house), and three years supervised release (with the first five months to be served in home confinement). Turner remains out on bond, pending the resolution of this appeal.

## ANALYSIS

We review the determination of a federal statute's constitutionality *de novo*. *United States v. Black*, 125 F.3d 454, 458 (7th Cir. 1997). Tuner asserts that 18 U.S.C. § 1033 (which makes it illegal for employees to embezzle—among other things—from insurance companies) exceeds Congress' power under the Commerce Clause, criminalizing a wholly intrastate activity. Turner's specific argument is that: (1) criminal acts are not encompassed within the Commerce Clause power, and (2) even though insurance affects interstate commerce, his conduct, which merely affected the insurance company, did not directly affect interstate commerce and cannot be regulated.

A. *The Power to Regulate Interstate Commerce*

The Court has enunciated three broad categories of activities that Congress may regulate using the power delegated to it in the Commerce Clause. *E.g.*, *United States v. Lopez*, 514 U.S. 549, 558-59 (1995). First, Congress may regulate the channels of interstate commerce.

*Id*. Channels refer to the transportation of a commodity or travel in interstate commerce. *See*, *e.g.*, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964) (interstate travel and places of public accommodation); *United States v. Darby*, 312 U.S. 100, 114 (1941) (shipment of manufactured goods); *Caminetti v. United States*, 242 U.S. 470, 489-91 (1917) (women and girls transported for "immoral" purposes); *Lottery Case* (*Champion v. Ames*), 188 U.S. 321 (1903) (lottery tickets). Second, Congress may regulate and protect the instrumentalities, persons, or things in interstate commerce "even though the threat may come only from intrastate activities". *Lopez*, 514 U.S. at 558-59. Instrumentalities, persons, or things in interstate commerce include railroads, aircraft, and trucks. *See*, *e.g.*, *Mitchell v. H. B. Zachry Co.*, 362 U.S. 310, 323 (1960) (describing railroads, truck companies and airlines as instrumentalities of interstate commerce); *Shreveport Rate Cases*, 234 U.S. 342 (1914) (railroad shipping rates). Third, Congress may regulate activities having a substantial relation to or substantial affect on interstate commerce. *Lopez*, 514 U.S. at 558-59. An activity "substantially affects interstate commerce" either directly or when considered with other similar activities in the aggregate. *See*, *e.g.*, *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 276-80 (1981) (coal mining); *Perez v. United States*, 402 U.S. 146, 156 (1971) (loan sharking); *Wickard v. Filburn*, 317 U.S. 111, 125-29 (1942) (growing of wheat on a local farm solely for personal consumption).

As the district court found that Congress did not exceed its authority because it was regulating an instrumentality or thing in interstate commerce, we must first determine whether this conclusion is correct. The statute at issue, 18 U.S.C. § 1033, provides, in relevant part: "Whoever—acting as, or being an officer, director, agent, or employee of, any person engaged in the business of

insurance whose *activities affect interstate commerce . . .* willfully embezzles, abstracts, purloins, or misappropriates any of the moneys, funds, premiums, credits, or other property of such person so engaged shall be punished as provided in paragraph (2)." 18 U.S.C. § 1033(b)(1) (emphasis added).[3] The statute repeatedly refers to "the business of insurance whose activities affect interstate commerce.*"* 18 U.S.C. §§ 1033(a)(1), (b)(1)(A), (c)(1), (d), (e)(1)(B); *see also* 18 U.S.C. § 1033(f)(3) (defining "interstate commerce" as used in the statute). Furthermore, the report from the House Judiciary Committee, to whom the bill was referred, also indicates that Congress enacted the law relying upon the third category of authority. The stated purpose of the law was to deal with *"interstate* insurance fraud schemes" that Congress felt were too complex and that current laws, state and federal, were inadequate to deal with the problem. H.R. Rep. No. 103-468 (1994) (emphasis added).

Turner inferentially bases his argument on the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, where Congress explicitly allowed the States to continue regulating insurance despite the interstate effects of such regulation. 15 U.S.C. § 1012(b); *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 417-19 (1946). Turner's argument is that insurance and criminal acts such as embezzlement are the province of the States to regulate. Despite the concurrent jurisdictional grant in McCarran-Ferguson and, thereby, the recognition that insurance has intrastate and interstate effects, the business of insurance can and does affect interstate commerce. *See United States v. South-*

---

[3]  18 U.S.C. § 1033 was enacted as the Insurance Fraud Prevention Act as part of an amendment to the Violent Crime Control and Law Enforcement Act of 1994. Pub. L. No. 103-322, 108 Stat. 2115 (1994). To our knowledge, embezzlement from insurance companies is not a violent crime.

*Eastern Underwriters Ass'n*, 322 U.S. 533, 552-53 (1944); *United States v. Robertson*, 158 F.3d 1370, 1371 (9th Cir. 1998). As the business of insurance does affect interstate commerce, Congress may choose to regulate it, in whole or part, and those activities that affect the business.

Although Congress chose the "affects interstate commerce" rationale to support this legislation (and we agree that insurance does affect interstate commerce) that does not mean insurance may not also be a channel from which interstate commerce flows. Banks are generally considered vehicles through which interstate commerce emanates, as banks conduct innumerable transactions with persons, companies, and banks in other states and countries. *E.g.*, *United States v. Watts*, 256 F.3d 630, 634 (7th Cir. 2001); *Weir v. United States*, 92 F.2d 634, 636 (7th Cir. 1937). Similarly, when a person purchases insurance from a company, the company holds the money in a pool with the money of other insured persons, and later the company pays claimants. Hence, insurance companies provide a vehicle through which premiums from the insured and payments to claimants flow in interstate commerce. *Cf. Black*, 125 F.3d at 460-62 (finding that child support payments regularly travel in interstate commerce); *Nat'l Cas. Co. v. Fed. Trade Comm'n*, 245 F.2d 883, 886 (6th Cir. 1957) (noting the McCarran Act gave the FTC the authority to regulate insurance on the grounds that insurance was part of the channels of commerce).

Whether we characterize the business of insurance as affecting interstate commerce or being a channel of commerce, we conclude Congress may regulate the insurance industry pursuant to Article I, § 8, clause 3. The question remaining is whether the prohibited activity, embezzlement from insurance companies, is included within this grant. Turner asserts that his actions do not touch upon interstate commerce and are outside the scope of Congress' authority.

B. *The Scope of the Interstate Commerce Power*

During the early years of the infant Republic, Congress enacted little commercial legislation, and the Supreme Court reviewed few such enactments. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824), marked the first major consideration of the scope of the Commerce Clause. In the majority opinion, Chief Justice John Marshall noted that Congress' commerce power, "like all others [powers] vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed by the Constitution." *Id*. at 196. This theory underscored the Court's Commerce Clause jurisprudence up until the late 1800s.

In 1887 and 1890, Congress enacted two important statutes both broad in scope, regulating economic activity. The Interstate Commerce Act and the Sherman Antitrust Act heralded a new intent by Congress to more thoroughly regulate interstate commerce. The Supreme Court responded by striking down several other acts, finding they reached activities beyond the clause's scope. *See*, *e.g.*, *United States v. E.C. Knight Co.*, 156 U.S. 1, 12 (1895) (finding manufacturing precedes commerce). However, the Court also upheld statutes that regulated interstate and intrastate commerce when regulating the latter as incidental and required when regulating the former. *See*, *e.g.*, *Shreveport Rate Cases*, 234 U.S. 342 (1914).

As part of the New Deal, Congress enacted a series of sweeping economic regulations which sought to fix hours, control rates and wages, and govern various aspect of the economy in order to engineer a recovery. *See*, *e.g.*, The National Industrial Recovery Act of 1933, 48 Stat. 195 (1933). The Court reacted by striking down the regulations because they exceeded Congress' power under the Commerce Clause. *See*, *e.g.*, *R.R. Ret. Bd. v. Alton R.R. Co.*, 295 U.S. 330 (1935); *A.L.A. Schechter*

*Poultry Corp. v. United States*, 295 U.S. 495, 550 (1935); *Carter v. Carter Coal Co.*, 298 U.S. 238, 304 (1936); *see also United States v. Butler*, 295 U.S. 495, 548 (1935) (striking down legislation enacted under the taxing and spending power as violating the Tenth Amendment).

In 1936, President Franklin Delano Roosevelt won reelection by a large margin, and in 1937, he introduced his "Court Packing" plan. The measure—which would have led to the appointment of an additional justice for any justice who had served ten years and was over seventy—was met with stiff resistance in Congress and failed. The controversy subsided as the makeup of the Court changed by death and resignation, and the Court began upholding New Deal legislation. *See*, *e.g.*, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937); *United States v. Darby*, 312 U.S. 100 (1941); *United States v. Wrightwood Dairy Co.*, 315 U.S. 110 (1942); *Wickard v. Filburn*, 317 U.S. 111 (1942). These decisions "ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined authority of Congress under that Clause." *Lopez*, 514 U.S. at 556. Not until 1995 did the Court again, in earnest, take up the issue of the limits of Congress' authority under the Commerce Clause.

In *Lopez*, the Supreme Court struck down the Gun-Free School Zones Act because it exceeded Congress' authority under the Commerce Clause. *Id*. at 549, 561-67. Since then, criminals and other litigants have sought to challenge statutes that went unquestioned as constitutional prior to *Lopez*. *See United States v. Watts*, 256 F.3d 630, 631 (7th Cir. 2001) (noting the defendant pled guilty but "reserved the right to pursue on appeal *a line of argument popular with criminal defendants these days*: whether Congress exceeded its Commerce Clause power") (emphasis added). And the subsequent cases of *United States v. Morrison*, 529 U.S. 598 (2000) and *Jones*

*v. United States*, 529 U.S. 848 (2000), have added to the challenges.

Turner challenges the statute at issue citing the Supreme Court's decision in *Lopez* as primary support (although he also cites *Morrison* and *Schechter Poultry*).[4] Turner's argument ignores both the narrow applicability of *Lopez's* facts to other cases and the careful legal analysis engaged in by the Court. Together, *Lopez*, *Morrison*, and *Jones* have defined the outermost reach of the commerce power, yet, those cases did not signal a turnabout, herald new restrictions on the power and did not overrule prior definitions of its scope. *See Black*, 125 F.3d at 460-62 ("Although the majority in *Lopez* intended to draw an outer limit to congressional authority, this does not mean that *Lopez* represents a retrenchment of already well-established Commerce Clause precedent."); *United States v. Spinello*, 265 F.3d 150, 153-54 (3d Cir. 2001); *United States v. Kenney*, 91 F.3d 884, 887 (7th Cir. 1996) ("But *Lopez* must also be noted for what it did not do."); *see also United States v. Wall*, 92 F.3d 1444, 1447-48 (6th Cir. 1996) (citing a number of cases upholding federal criminal statutes after *Lopez* and noting that "[m]ost courts have resisted urgings [by criminal defendants] to extend *Lopez*").

In *Lopez*, the Court analyzed the regulation at issue under the third category, "substantially affects interstate commerce". The Court found that the Gun-Free School Zones Act did not regulate economic activity or

---

[4] *Morrison* provides little support for Turner's arguments as it dealt not with a criminal but a civil remedy. Moreover, the Court distinguished a similar criminal provision created under the same act, quoting a court of appeals case upholding the section as a valid exercise of the Commerce power. *Morrison*, 529 U.S. at 613 n.5 (quoting 18 U.S.C. § 2261(a)(1)).

commerce no matter how "broadly one might define those terms". *Lopez*, 514 U.S. at 561, 567 ("The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce."). At the same time, the Court went to great lengths to distinguish *Wickard*—a case the majority said was "perhaps the most far reaching example of Commerce Clause authority over intrastate activity"—from the possession of a gun in a school zone. *Id.* at 560. Also, the Court indicated that a similar regulation, properly enacted and circumscribed to reach interstate activity, might pass muster, but the Gun-Free School Zones Act failed because there was no indication and no requirement that either the person or the firearm "have any concrete tie" or have moved in interstate commerce. *Id.* at 567. What *Lopez* did not do was invalidate a federal criminal statute regulating criminal activity that was tied to and affected interstate commerce. *See Morrison*, 529 U.S. at 610-12 ("But a fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case.").

More importantly, the subsequent case of *Jones v. United States*, examining a criminal statute, provides ample support for the proposition that Congress' commerce power has not suddenly contracted. 529 U.S. at 851. In *Jones*, the Court examined a federal arson statute that made it a federal crime to "damage or destroy, 'by means of fire or an explosive, any . . . property *used in* interstate or foreign commerce or *in any activity affecting* interstate or foreign commerce.'" *Id.* at 850 (quoting 18 U.S.C. § 844(i)) (emphasis added). The question was whether a private residence fell within the definition of "used in" or "affecting" interstate commerce. *Id.* at 850-51. The Court focused on those terms, concluding that Congress intended only to reach those buildings which were

"used in" or "affected" interstate commerce. *Id.* at 854-55. A building used as rental property was "used in" or "affected" interstate commerce; however, not a private, personal dwelling which had neither commercial purposes nor was used in any commercial undertaking such as a home office. *Russell v. United States*, 471 U.S. 858, 859-62 (1985); *Jones*, 529 U.S. at 855-57.

The salient, overriding inquiry in both *Jones* and *Lopez* was the search for a commercial activity that Congress could properly regulate. *Jones*, 529 U.S. at 858-59; *Lopez*, 514 U.S. at 561-67. If there is an interstate commercial activity which meets any of the three *Lopez* categories Congress may regulate that activity *and* the actions or activities which secondarily affect the primary commercial activity. Hence, Congress may regulate the arson or bombing of any commercial building because the destruction of the building indirectly *affects* interstate commerce by virtue of the fact that the building was used in interstate commerce. *Russell*, 471 U.S. at 862.

The business of insurance does affect interstate commerce. Turner asserts that *his* activities did not directly affect interstate commerce, therefore, Congress' prohibition of insurance embezzlement is *ultra vires*. Turner asks us to divide his actions from those engaged in by Allstate. However, we do not look solely at Turner's crime, as he would have us do; rather, we look to the "class of activities" and determine their "total incidence" on interstate commerce. *Perez*, 402 U.S. at 153-54; *Maryland v. Wirtz*, 392 U.S. 183, 193 (1968); *see also* 18 U.S.C. §§ 1033(a)(1), (b)(1) ("the business of insurance whose activities affect interstate commerce."). If embezzlement affects the business of insurance, positively or negatively, then Congress may also regulate that activity as incident to regulating the business of insurance. *E.g.*, *Perez*, 402 U.S. at 150-55; *Wickard*, 317 U.S. at 125. Turner's crime may be local and have only an indirect effect on commerce;

nevertheless, the activity may be reached by Congress by virtue of the fact that it affects Allstate's business—which, in turn, affects interstate commerce—or in the aggregate, embezzlement may negatively effect and destabilize the entire insurance industry. *Perez*, 402 U.S. at 150-56; *Wickard*, 317 U.S. at 125; *Black*, 125 F.3d at 460-61 (holding that "Congress can criminalize [the failure to pay child support] just as it has other impediments to interstate commerce."). In fact, Congress enacted 18 U.S.C. § 1033 for the purpose of preventing the destructive aggregate effects of embezzlement by multiple employees, agents, and officers throughout the insurance industry, in order to preclude another crisis akin to the massive savings and loan failures of the 1980s. H.R. REP. NO. 103-468.

If Allstate is a channel of interstate commerce, it is proper to assume that the money Turner embezzled from the company moved in interstate commerce. Turner's activity therefore impeded the channels of interstate commerce and the statute properly reached his conduct. The limiting principle is that the activity initially regulated must be a commercial enterprise; Congress may then regulate any activity which effects, positively or negatively, that commercial enterprise. *Wickard*, 317 U.S. at 125-28 ("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'").

**CONCLUSION**

Turner argues policy in this court, *i.e.*, that embezzlement and most other criminal acts are best left to the states to regulate and Congress should not go around federaliz-

ing every local criminal act. Whether the statute should have been enacted was a policy decision made by Congress. *See Black*, 125 F.3d at 459 ("Congress has often used this positive power to pass laws that 'help the States solve problems that defy local solutions.'") (quoting *United States v. Sage*, 92 F.3d 101, 105 (2d Cir. 1996). And, of course, Turner, like any other citizen, is free to petition the government to change the law. But the statute at issue, 18 U.S.C. § 1033, regulates an activity that affects the business of insurance, which either affects interstate commerce or is itself a channel of commerce. Congress may therefore regulate the insurance industry and those activities which positively or negatively affect the business as incidental to the larger regulatory scheme. As embezzlement negatively affects the insurance industry, Congress may prohibit that conduct through a proper exercise of its Commerce Clause authority. AFFIRMED.

A true Copy:

       Teste:

$$\overline{\hspace{4cm}}$$

*Clerk of the United States Court of Appeals for the Seventh Circuit*