UNITED STATES of America,
Plaintiff–Appellee,

v.

Daphney D. TINGLE, Defendant–Appellant.

No. 98–2637.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1998.

Decided July 8, 1999.

Christian R. Larsen (argued), Thomas P. Schneider, Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

Jimmie L. Jones (argued), Chicago, IL, for Defendant–Appellant.

Before COFFEY, RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge.

A jury convicted Daphney Tingle of conspiring to distribute cocaine base and distributing cocaine base. On appeal, she argues that: the district court improperly denied her motion for a continuance of the

trial; the evidence was insufficient to convict; the Eastern District of Wisconsin was an improper venue for her trial on the distribution charge; the district court erred in failing to grant a mistrial based on the government's use of perjurious testimony; and the jury instruction dealing with the testimony of witnesses was erroneous. Because the Eastern District of Wisconsin was not a proper venue, we reverse Tingle's conviction for distributing cocaine base, but affirm her conviction for conspiring to distribute cocaine base.

## I. Facts

Beginning at least by 1995, Tingle ran a drug distribution business out of her home in Chicago, Illinois. Testimony from a co-conspirator—Eric Laws—indicated that Tingle would "front" him drugs, that is, sell drugs on credit. Laws, who lived and sold the drugs in Racine, Wisconsin, testified that he or his couriers would pick up cocaine from Tingle or her boyfriend "Tutu" at Tingle's home, and would transport it to Racine.

Another co-conspirator—Mario Hudson—who joined the conspiracy in the latter part of 1996, corroborated this testimony. He confirmed that Tingle dispensed crack cocaine to him and that he paid for it only after reselling the drugs. In May 1996, after the police arrested Hudson for drug possession, he began cooperating with the police. Hudson told the police that on June 23, 1996, a courier named Oscar Rathers would be transporting drugs from Tingle's house to Racine.

As Hudson predicted, Rathers left Racine on June 23, boarded a train to Chicago, and proceeded to Tingle's house. Carrying a small backpack, Rathers entered Tingle's home, stayed inside for eight minutes, and then departed for the train station. He then returned to Racine delivering the backpack to the home of Allen Judon. After Rathers left Judon's home, the police arrested him and found him carrying about two ounces of crack cocaine. Shortly thereafter, the police exe-cuted a search warrant at Judon's house and recovered the backpack, which contained over 600 grams of crack cocaine.

On August 19, 1997, Tingle was indicted for one count of conspiring to distribute in excess of fifty grams of cocaine base, and one count of distributing cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) & 846, and 18 U.S.C. § 2. After a four-day trial, the jury convicted Tingle of both counts. She was sentenced to 262 months' imprisonment and five years of supervised release for each count, with the sentences to run concurrently.

## II. Analysis

### A. Motion to Continue Trial

Tingle first argues that the district court improperly denied her motion to continue the trial. " '[T]his court will overturn a trial court's disposition of a motion to continue only for an abuse of discretion and a showing of actual prejudice.' " *United States v. Koen*, 982 F.2d 1101, 1114 (7th Cir.1992) (quoting *United States v. Blandina*, 895 F.2d 293, 297 (7th Cir.1989)). In assessing claims of inadequate time to prepare for trial, we examine the amount of time available for preparation, the likelihood of prejudice from the denial of additional time, the complexity of the case, the adequacy of the defense actually provided at the trial, the skill and experience of the attorney, and any representation of the accused by other attorneys. *United States v. Zambrana*, 841 F.2d 1320, 1327 (7th Cir.1988). Because district courts necessarily require great latitude in scheduling trials, broad discretion must be given to a district court in its decision concerning a motion to continue. *Morris v. Slappy*, 461 U.S. 1, 11, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).

Tingle was arraigned on September 17, 1997. Two days later, her family retained attorney Chester Blair to represent her. On October 30, a magistrate judge allowed Tingle to substitute counsel, but cautioned the parties that the court's scheduling or-

der was to remain in effect, including the November 17 trial date. On November 12 or 13, just days before her scheduled trial, one of Tingle's new attorneys—Jimmie Jones—moved to continue the trial until December 22, 1997, citing other professional commitments and the need to further prepare Tingle's case. The district judge eventually postponed the trial until December 1, but refused to grant the additional twenty-one days requested by Tingle.

Tingle argues in a conclusory fashion that she "was severely prejudiced" by the district court's denial of her motion to continue. She fails, however, to specify any way in which she suffered prejudice, other than to contend that she needed more time to prepare her defense. Applying the factors mentioned above, we note that Tingle's first attorney represented her interests and filed motions on her behalf, including a motion to suppress evidence. Furthermore, Tingle's motion to continue indicates that Jones is an experienced criminal litigator. It is also relevant that this is a straightforward drug conspiracy case, which is not particularly complex. At trial, the government produced only ten witnesses whose testimony concerned common events. Other than her coconspirators, most of their testimony concerned relatively minor points. In any event, Jones was sufficiently prepared to raise numerous evidentiary objections during the direct examination of the government's witnesses, aggressively cross-examine them, and to successfully demonstrate that Eric Laws' recollection was faulty.

Besides Jones, Tingle was also represented at trial by another attorney—Mark Lyon. Furthermore, Tingle has not argued that additional time would have resulted in a more vigorous defense, nor has she shown that her defense was deficient in any respect. Thus, Tingle has failed to demonstrate that the district court abused its discretion in granting only a two-week continuance, and she failed to show that the failure to grant a further continuance caused her actual prejudice.

**B. Sufficiency of the Evidence**

 Tingle next argues that the evidence was insufficient to convict her of conspiring to distribute cocaine base. This challenge requires us to determine whether in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *United States v. Hach*, 162 F.3d 937, 942 (7th Cir.1998). To sustain a conspiracy conviction, the record must contain evidence showing that a conspiracy to distribute cocaine existed, and that Tingle knowingly joined it. *Hach*, 162 F.3d at 942. To establish the existence of a drug conspiracy, as opposed to a series of mere buy-sell agreements, the government must provide "proof of an agreement to commit a crime other than the crime that consists of the sale itself." *United States v. Pearson*, 113 F.3d 758, 761 (7th Cir.1997) (quoting *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir.1993) (en banc)). In determining whether a conspiracy existed, a defendant's guilt can often be inferred from circumstantial evidence, including whether she stood to gain financially from the conspiracy. *United States v. Miller*, 159 F.3d 1106, 1110 (7th Cir.1998). We have also identified four highly probative factors: (1) the length of affiliation; (2) the established method of payment; (3) the extent to which the transactions were standardized; and (4) the demonstrated level of mutual trust. *Hach*, 162 F.3d at 943. "An individual's participation in drug deals which involve credit transactions such as 'fronting' is strong evidence of membership in a conspiracy." *United States v. Rodriguez*, 53 F.3d 1439, 1445 (7th Cir. 1995) (internal quotations omitted).

In the present case, the jury heard testimony from Tingle's associates in her cocaine distribution activities: Eric Laws, Mario Hudson, and Oscar Rathers. Eric Laws identified Tingle at trial, and testi-

fied that he first obtained cocaine from her at her home in Chicago around the "[f]irst part of '95." He also stated that he generally received from Tingle two deliveries of cocaine per month. Tingle fronted the drugs to Laws. The jury also learned that Laws' drug-dealing enterprise was briefly impeded by his incarceration between May and September 1995, but his activities began again when he was released. Laws testified that generally he or his comrades (Derrel Garth, Davin Laws, Oscar Rathers, and Mario Hudson) would go to Chicago about twice each month to get the drugs. Laws estimated that after his release from prison in 1995 he made between ten and fifteen trips to Chicago himself. Usually Tingle or her boyfriend Tutu would give them a kilogram of cocaine, and would charge between $22,000 and $26,500, which Laws would pay only after he sold the cocaine to others. Laws further testified that although he usually obtained cocaine powder from Tingle (from which he manufactured crack cocaine), he also obtained crack cocaine from her.

Oscar Rathers testified that he acted as a drug courier. He would periodically go to Tingle's house in Chicago to meet someone he knew only as "Daf." He would give her his bag, she would fill it, and he would return to Racine with the drugs and get paid $300 for his efforts. On two occasions he also obtained two smaller bags of cocaine from Tingle, which he sold himself.

Mario Hudson testified that he was involved with Eric Laws in selling crack cocaine between January and June 1996. Hudson stated that in February 1996 he accompanied Laws to Gurnee Mills, Illinois to deliver to Tingle drug money which Laws owed. A few days later, Hudson and Laws had a conversation in which Laws said he needed to get some more drugs, so they sent Oscar Rathers to Chicago for them. Hudson testified that they generally obtained the cocaine from Chicago twice every month. Laws would then distribute the cocaine among a group consisting of Davin Laws, Allen Judon, and Hudson, who would sell the cocaine to others. Hudson also stated that the cocaine came in the form of cocaine base (or crack) and powder cocaine.

DEA Special Agent Erin Desmond also testified at trial. Desmond testified that she was surveilling Tingle's home on June 23, 1996. She personally saw Rathers enter the house with a knapsack, and a few minutes later she saw him exit with the same knapsack. Desmond also testified that she was present when Tingle was arrested and questioned about her involvement in the sale of cocaine. After signing a waiver of her rights, Tingle admitted she made telephone calls in an effort to obtain cocaine for Eric Laws, and that the Laws brothers obtained cocaine from her residence after other distributors dropped it off there.

To summarize, Tingle's comrades testified that she fronted drugs, and that they delivered money for the cocaine to her and her boyfriend after it was resold. Their testimony also indicated a long-term association with Tingle. The evidence showed that there was a degree of trust among Tingle and her associates, and they had a standardized practice for the distribution of the cocaine. Finally, even Tingle admitted to the officers that she played at least some part in arranging for suppliers to drop off cocaine at her residence so that Eric Laws and his comrades could later retrieve it. In short, there was an abundance of evidence upon which the jury could have convicted Tingle of conspiring to distribute cocaine base. Hence, Tingle cannot prevail on this ground.

## C. Improper Venue

Tingle also challenges her conviction on Count II for distribution of cocaine base, arguing that the Eastern District of Wisconsin was an improper venue for her trial, because this offense took place in the Northern District of Illinois. This, she argues, requires a reversal of her

**726**

distribution conviction.[1] When faced with a claim of improper venue we view the evidence in the light most favorable to the government in determining whether the government showed by a preponderance of the evidence that the crime occurred in the district charged. *United States v. Brandon*, 50 F.3d 464, 469 (7th Cir.1995).

Article III of the U.S. Constitution states: "Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed." U.S. Const. art III, § 2, cl. 3. Similarly, the Sixth Amendment guarantees a defendant a trial "by an impartial jury of the State and district where the crime shall have been committed ...." U.S. Const. amend. VI. The Federal Rules of Criminal Procedure echo these provisions by requiring that "the prosecution shall be had in a district in which the offense was committed." Fed.R.Crim.P. 18. Accordingly, when "a defendant is charged in more that one count, venue must be proper with respect to each count." *United States v. Granados*, 117 F.3d 1089, 1091 (8th Cir.1997).

When Congress has not specifically defined where a crime should be deemed to have occurred, the " *'locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it.' " *Cabrales*, 524 U.S. at ——, 118 S.Ct. at 1776 (quoting *United State v. Anderson*, 328 U.S. 699, 703, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946)). "To determine venue, we examine the key verbs in the statute defining the criminal offense to find the scope of the relevant conduct." *United States v. Georgacarakos*, 988 F.2d 1289, 1293 (1st Cir.1993) (internal quotations omitted). "Actions which are merely preparatory or prior to the crime," however, "are not probative in determining venue." *Id.*

A problem potentially arises when the acts constituting a crime are committed in more than one state or district. To address these multi-state crimes, Congress enacted legislation (under its power to define the elements of a crime) which allows these crimes—sometimes called "continuing offenses"—against the United States to be tried in any of the venues in which a part of the crime was committed.[2] *See* 18 U.S.C. § 3237(a). Under this statute, venue is constitutionally proper in any district in which a part of the crime was committed. *Granados*, 117 F.3d at 1091. " '[W]here a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done.' " *United States v. Rodriguez–Moreno*, 526 U.S. 275, ——, 119 S.Ct. 1239, 1244, 143 L.Ed.2d 388 (1999) (quoting *United States v. Lombardo*, 241 U.S. 73, 77, 36 S.Ct. 508, 60 L.Ed. 897 (1916)). The statute provides in part:

[A]ny offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and ... may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

18 U.S.C. § 3237(a). Thus, venue for continuing crimes is proper where the crimes began, continued, or were completed.

---

**1.** Tingle concedes that the Eastern District of Wisconsin was a proper venue for the conspiracy charge. However, this does not prevent Tingle from challenging the venue for the distribution count.

**2.** We note that the term "continuing offense" can be used in more than just a factual sense. *See United States v. Yashar*, 166 F.3d 873, 875 (7th Cir.1999) (discussing continuing offenses for purposes of statutes of limitations and noting that the term is distinguishable from its use in the factual sense).

*United States v. Kramer*, 955 F.2d 479, 486 (7th Cir.1992); *Georgacarakos*, 988 F.2d at 1293. Distribution of drugs can be a continuing offense, and thus governed by § 3237(a) for purposes of venue, where there are multiple acts of the defendant which constituted distribution. *Georgacarakos*, 988 F.2d at 1293; *United States v. Brunty*, 701 F.2d 1375, 1380 (11th Cir. 1983); *cf. Andrews v. United States*, 817 F.2d 1277, 1279 (7th Cir.1987).

In the present case, Tingle was charged with a violation of 21 U.S.C. § 841(a)(1), which states: "it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, [or] distribute ... a controlled substance."[3] The indictment specifically charged that the offense was committed: (1) on June 23, 1996, (2) by distributing cocaine base to Oscar Rathers, (3) in the Eastern District of Wisconsin and the Northern District of Illinois. The government had the burden of establishing the elements of venue by a preponderance of the evidence. *Brandon*, 50 F.3d at 469. The evidence showed that Tingle indeed distributed cocaine base to Oscar Rathers on June 23, 1996 in the Northern District of Illinois. It is also apparent that Tingle distributed cocaine to Allen Judon (through Rathers) on June 23, 1996 in the Eastern District of Wisconsin. But the problem is that there was no evidence that Tingle distributed cocaine on June 23, 1996 to Oscar Rathers in Wisconsin (the venue of the trial). Instead, the evidence clearly established that all of the acts necessary for Tingle's crime of distributing cocaine *to Rathers* were committed in Illinois, and none were committed in Wisconsin.

Of course, if the indictment had alleged that Tingle had distributed cocaine base to Allen Judon (or others) in the Eastern District of Wisconsin, venue would have been proper there, regardless of the fact that Tingle never left Illinois. But this is a separate offense from the distribution to Rathers, and any attempt to allege these two offenses in one count of the indictment would have resulted in a duplicity problem.[4] *United States v. Marshall*, 75 F.3d 1097, 1111 (7th Cir.1996) (" 'Duplicity' is the joining of two or more offenses in a single count."). As it is, the indictment did not allege this distribution to Judon or anyone other than Rathers. Because the government failed to show that even part of the crime of distributing cocaine base to Oscar Rathers occurred in the Eastern District of Wisconsin, it was not a proper venue for her trial on this charge. Moreover, the fact that the government alleged that Tingle aided and abetted the crime of distribution of cocaine base to Oscar Rathers cannot save her conviction, for the cocaine base was distributed to Oscar Rathers only in Illinois, and any aiding and abetting done by Tingle was done in Illinois.

The government's reliance on *United States v. Pomranz* is unavailing. 43 F.3d 156 (5th Cir.1995). In *Pomranz*, the defendant was charged with conspiracy to distribute marijuana and unlawful use of a firearm during a drug trafficking offense. *Id.* at 157. Pomranz argued that his trial for both crimes in the Northern District of Texas was improper because he only used the firearm in Oklahoma. The Fifth Circuit affirmed his conviction. *Id.* at 158. It held that the drug trafficking offense was a predicate offense of the firearm charge, and because this predicate offense was committed in the Northern District of Tex-

---

3. The term "distribute" means to deliver. 21 U.S.C. § 802(11). "Deliver" means "the actual, constructive, or attempted transfer of a controlled substance...." 21 U.S.C. § 802(8). Courts usually interpret the term "distribution" and related words quite broadly. *United States v. Ahumada–Avalos*, 875 F.2d 681, 683 (9th Cir.1989).

4. Notably, Tingle argues that the second count was duplicitous and that there was insufficient evidence that Tingle distributed cocaine base to Rathers in Wisconsin. Because we reverse Tingle's distribution conviction, there is no need to address these issues.

as, part of the firearm charge was committed in the Northern District of Texas. *Id.* at 162. Therefore, Texas was a proper venue for the trial on the firearm charge. Recently, the Supreme Court used similar reasoning in holding that venue was proper for a use of a firearm charge wherever the underlying offense of kidnaping continued, regardless of whether the firearm in question was also used in that venue. *Rodriguez–Moreno*, —— U.S. at ——, 119 S.Ct. at 1244.

These cases are easily distinguishable from Tingle's. In *Pomranz* and *Rodriguez–Moreno*, the underlying offenses (conspiracy to distribute drugs and kidnaping) were essential elements of the firearm charge. But Tingle's conspiracy offense (which was committed in Wisconsin) was not an essential element of her distribution charge. Thus, even though she committed at least part of the conspiracy offense in Wisconsin, Tingle did not commit any part of the charged distribution offense in Wisconsin. Without her having committed at least some part of the distribution offense in Wisconsin (and it need only have been a small part), venue was not proper there. Because the Eastern District of Wisconsin was not a proper venue for Tingle's trial on this count,[5] her conviction of distribution of cocaine base must be reversed. This will not affect Tingle's sentence, however, for the sentence on this count was to run concurrent with her conspiracy sentence.

### D. Use of Perjury

■■■■ Tingle contends that one of the government's witnesses—Eric Laws—committed perjury at trial, the government knew of the perjury, and therefore the district court erred in denying her motion for a mistrial.

■■■■ We review the district court's refusal to grant a new trial based on the government's purported use of perjury for an abuse of discretion. *United States v. Thompson*, 117 F.3d 1033, 1035 (7th Cir. 1997). The district court abuses its discretion when it makes an error of law or when it makes a clearly erroneous finding of fact. *United States v. Silva*, 140 F.3d 1098, 1101 n. 4 (7th Cir.1998). To obtain a new trial based on use of perjurious testimony, a defendant must establish that (1) the government presented perjured testimony; (2) the government knew or should have known of the perjury; and (3) there is some likelihood that the false testimony affected the jury's verdict. *Thompson*, 117 F.3d at 1035.

To satisfy the first requirement, Tingle contends that Eric Laws testified that he obtained cocaine from Tingle in January 1995, which had to be false, because Tingle was incarcerated for an unrelated offense between January and May 1995.[6] Tingle, however, mischaracterizes Laws' testimony. On direct examination he testified that he dealt with Tingle during the "[f]irst part of '95." This testimony is ambiguous, as the "first part of '95" could reasonably be interpreted to mean the first quarter of 1995, the first half of 1995, the first three quarters of 1995, and so on. If the "first part of '95" were construed to mean "around the first part of 1995," this might also include the latter part of 1994. In short, while a person could reasonably interpret the "first part of '95" to mean

---

5. This rule did not place an undue burden on the government by requiring two trials. The Northern District of Illinois was a proper venue for a trial on both counts alleged in the indictment, thus permitting the government to try Tingle in Illinois for both crimes.

6. Like Eric Laws, Tingle had some difficulty in correctly recalling the dates of her incarceration. She sometimes argues that she was incarcerated in 1995, at other times she contends that it was in 1996, and still another time that it was 1997. Because the indictment does not charge Tingle for any crimes committed in 1997, we presume that Tingle's mention of this year is an error, or is at least irrelevant. Furthermore, because the part of Eric Laws' testimony to which Tingle objects relates to dealings with Tingle in the "[f]irst part of '95" we presume that this is the period on which her argument is based.

"January 1995," it is also susceptible to many other interpretations, including periods during which Tingle was not imprisoned. Because of this ambiguity, Laws was forced to clarify his statements on cross-examination and redirect. Eric Laws testified that he knew Tingle was imprisoned during the early part of 1995 (although he could not remember the exact time period), and that during her incarceration he merely talked with her on the telephone, and obtained cocaine from her boyfriend, Tutu. Despite Tingle's imprisonment, cocaine was still distributed from her home in Chicago, just as it was before and after her incarceration. He also testified that he could not remember the exact date of any occasion that he met with Tingle, but he knew that he began dealing with Tingle at least six months before her incarceration in 1995. This testimony does not contradict Eric's other testimony or any other evidence presented at trial. Thus, Tingle has failed to show that Eric Laws' testimony was perjurious.

■ Finally, assuming *arguendo* that Laws had testified falsely, Tingle failed to show that there was some likelihood that this testimony impacted the jury's verdict, especially considering that Laws admitted he was unsure of the exact date he began receiving cocaine from Tingle. If anything, this aided Tingle's case by demonstrating to the jury that Laws' memory was imperfect. Beyond that, the fact that Tingle was unable to counter the testimony that she fronted cocaine on numerous occasions between January 1995 and June 1996, and her own statements to the officers that Eric Laws obtained cocaine from her house, also makes it highly unlikely that Eric Laws' statements had any further adverse impact on the jury's assessment of Tingle's guilt. Thus, Tingle cannot prevail on this argument.

## E. Jury Instruction

■ Tingle also challenges a jury instruction concerning the testimony of the witnesses. She objects to the instruction that jurors "*should* use statements by other persons to decide what the defendant did or said." Specifically, Tingle objects to the use of the word "should," because she believes that this effectively instructed the jurors that the testimony of the government's witnesses is necessarily credible, thus denying the jury its prerogative of making credibility determinations.

■ We review jury instructions to determine whether they provide fair and accurate summaries of the law. *United States v. Abdelkoui*, 19 F.3d 1178, 1182 (7th Cir.1994). The district court is given substantial discretion with respect to the exact wording of instructions. *Id.* Looking at the charge as a whole, we must determine whether the instruction misled the jury concerning the issues or its duty in relation to those issues. *United States v. McClellan*, 165 F.3d 535, 549 (7th Cir. 1999).

The instruction at issue here cannot reasonably be read to mean, as Tingle suggests, that all of the witnesses should be believed. Furthermore, reading the instructions as a whole, we see that the district court specifically told the jurors that they were "the sole judges of the credibility of witnesses and the weight their testimony deserves." Also, the jury was informed that "[i]f you believe any witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you may think it deserves." Thus, no reasonable jury could have understood the instructions to mean that all of the government's witnesses were to be considered credible.

■ Finally, we also note that we previously approved the exact language of this instruction, including the use of the word "should." *See United States v. Martinez de Ortiz*, 907 F.2d 629, 635 (7th Cir.1990). However, other formulations may be preferable, as the wording of jury instructions is not an exact science. *United States v. Smith*, 131 F.3d 685, 688 (7th Cir.1997). Thus, while use of the word "should" is not incorrect, in the future, to avoid a similar question, district courts would be better advised to substitute the term "may." In

this instruction, use of the term "may" more accurately reflects the idea sought to be conveyed. Likewise, use of the term "may" would foreclose appeals based on arguments like Tingle's.

### III. Conclusion

The district court did not abuse its discretion in failing to grant a further continuance of the trial. Moreover, the evidence presented at the trial was more than sufficient to convict Tingle of conspiracy to distribute cocaine base. Because Tingle failed to show that the government introduced perjurious testimony, or that this testimony impacted the jury's verdict, the district court did not err in refusing to grant a new trial on the conspiracy charge. The district court also did not err in instructing the jury. As to the distribution charge, Wisconsin was not a proper venue for this crime as it was charged in the indictment. Therefore, we reverse Tingle's conviction of distribution of cocaine base (Count II), and affirm her conviction of conspiracy to distribute cocaine base. Because Tingle's sentences for each count were to run concurrently, this reversal will not affect her terms of imprisonment or supervised release.