In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-1385 & 05-1582

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THEODORE LEE and ANDRE LEE,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 434—**Harry D. Leinenweber**, *Judge.*

ARGUED DECEMBER 2, 2005—DECIDED MARCH 2, 2006

Before BAUER, POSNER, and MANION, *Circuit Judges.*

BAUER, *Circuit Judge.* Brothers Theodore Lee and Andre
Lee (the Lees) were convicted on conspiracy and substantive
charges of uttering counterfeit securities in violation of 18
U.S.C. §§ 371 and 513(a). The Lees challenge their convic-
tion, claiming that the government did not intro-
duce sufficient evidence to prove that the counterfeit checks
were "of . . . an organization" that affected interstate
commerce, and that the district court's jury instruction
concerning interstate commerce was insufficient. We affirm
their convictions on all counts except Counts Six and Seven.
The convictions on those two counts are reversed.

## I. Background

The Lees were engaged in a counterfeit payroll check scheme in Chicago. They made payroll checks that purported to be drawn on the accounts of legitimate businesses, but were in fact drawn on accounts that had closed or had never existed. In early 2000, the Lees and their brother Terrence provided Robert Johnson, an account holder at St. Paul Federal Savings (St. Paul), with counterfeit payroll checks. Over the course of two weeks, Johnson cashed at St. Paul eleven checks drawn on a Citibank account held by Prestige Electrical Maintenance (Prestige). Another St. Paul account holder, Titus Ellis, cashed five counterfeit checks provided by the Lees. Those checks were drawn on an account held by Urban Insurance (Urban) at Standard Federal Bank (Standard).

After a St. Paul bank investigator informed Johnson that he faced prosecution for his role in the scheme, he agreed to participate in an undercover operation. On June 2, 2000, Tracy Anderson drove Johnson and Theodore Lee to St. Paul. Lee gave Johnson a counterfeit check drawn on a Bank of Waukegan account held by Slager Heating & Cooling Co. (Slager). After Johnson cashed it, the three men traveled to another St. Paul branch, where Secret Service agents arrested Lee and Anderson. The agents searched Anderson's vehicle and found another check payable to Johnson and drawn on an account at the Bank of Waukegan. In a search of the Lee residence later that day, agents found several more counterfeit checks.

On September 25, 2002, a grand jury issued a seven-count indictment charging the Lees, Terrence Lee, Johnson, and Anderson. Count One charged all five defendants with conspiracy to make, utter, and possess counterfeit securities of an organization, in violation of 18 U.S.C. §§ 371 and 513(a). Counts Two through Seven charged one or more of the five defendants with uttering and possessing counterfeit

securities of an organization, in violation of 18 U.S.C. § 1951. Each of these counts identified St. Paul as the victim organization. Counts Two and Three charged defendants for the eleven checks drawn on the Urban account at Standard. Counts Four and Five charged defendants for the five checks drawn on the Prestige account at Citibank. Counts Six and Seven charged defendants for the two checks drawn on the Slager account at the Bank of Waukegan.

Co-defendants Anderson, Johnson, and Terrence Lee pleaded guilty. As part of his plea agreement, Johnson agreed to cooperate with the government. The Lees went to trial, where the government sought to prove the existence of, and the Lees' role in, the check-bouncing scheme. The government introduced evidence that the account holders or banks named on the checks existed. Johnson testified that Andre Lee, when recruiting him for the scheme, stated that the checks came from "one of their friends that worked at a big company." Johnson also stated that he looked up Prestige on his own, by using both an Internet "Yellow Pages" site and "411."

Gladys Blancas, an investigator for Charter One Bank (which purchased St. Paul), testified that St. Paul's deposits were insured by the Federal Deposit Insurance Corporation (FDIC). She also stated that when St. Paul forwarded the counterfeit checks to issuing banks Citibank and Standard for payment, they were returned unpaid. The returned checks, which were entered into evidence, were stamped "counterfeit," "refer to maker," or "no account known." Blancas explained that the term "refer to maker" was generally "used by banks to return a check as unpaid," and the term "no account known" generally meant that "according to the bank's records, they do not find a history on that account." Blancas also testified that, after receiving the returned checks, she investigated by contacting both

Citibank and Standard. She offered no testimony about the Bank of Waukegan.

Defendants tendered a jury instruction stating that the government must prove beyond a reasonable doubt that the organizations listed as issuing companies on the checks operated in or affected interstate commerce. The court denied this instruction. The court later overruled the defendants' objection to the government's elements instruction, which they argued did not adequately state the interstate commerce element of the offense.

On February 12, 2004, the jury found Theodore Lee guilty on Counts One, Four, Five, Six, and Seven, and not guilty on Counts Two and Three. The jury found Andre Lee guilty on all seven counts. The court denied the defendants' motion for acquittal or, in the alternative, for a new trial under Fed. R. Crim. P. 29. The court sentenced Theodore Lee to concurrent sentences of five months' imprisonment on the five counts, followed by three years of supervised release. Andre Lee was sentenced to concurrent terms of sixteen months' imprisonment on the seven counts, followed by five years of supervised release. The defendants appealed.

## II. Discussion

The defendants argue that the district court erroneously denied their motion for judgment of acquittal. We review the denial of motion for a judgment of acquittal *de novo*. *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003).

## A. Section 513(a) Conviction

The statute prohibits making, uttering, or possessing a counterfeit or forged security "of a State or political

subdivision thereof or of an organization, with intent to deceive another person, organization, or government." 18 U.S.C. § 513(a). A check is a "security" for purposes of the statute. 18 U.S.C. § 513(c)(3)(A). The statute defines "organization" as "a legal entity . . . which operates in or the activities of which affect interstate or foreign commerce." 18 U.S.C. § 513(c)(4). Thus, it was incumbent on the government to prove that the disputed checks were "of" a "legal entity" that affected interstate commerce.

The government now argues that it could prove this element at trial by establishing that either the payor company or the drawee bank named on the check was an existing organization. The stipulation agreed to by the parties referenced the companies, but it stated that the checks "either, one, were not authorized by the named payor corporation or, two, named a fictitious payor corporation and corporate account." Because of this ambiguity, the stipulation did not establish that the companies were existing organizations because it allowed for the possibility that they were fictitious. As other Courts of Appeals have held, "fictitious entities are not organizations under 18 U.S.C. § 513." *United States v. Wade*, 266 F.3d 574, 581 (6th Cir. 2001); *see also United States v. Barone*, 71 F.3d 1442 (9th Cir. 1994) (holding that a nonexistent company does not constitute an "organization" under the statute when its only effect on interstate commerce results from the passage of its forged securities to a victim that operates in interstate commerce).

We agree with other Courts of Appeals that "section 513 does not expressly or impliedly state that a document may be the security of only one organization." *Wade*, 266 F.3d at 581-82; *see also United States v. Chappell*, 6 F.3d 1095, 1099 (5th Cir. 1993). The jury, therefore, could rationally have concluded that checks "were securities of both the issuing banks and account holders." *United States v. Kellum*, 119 Fed. Appx. 32, 34 (9th Cir. 2004); *see*

*also United States v. Jackson*, 155 F.3d 942, 946 (8th Cir. 1998). In its case-in-chief, the government needed to present affirmative evidence indicating that either the payor companies or the drawee banks existed.

### 1. Counts Four and Five

For the two counts involving the checks drawn on the Prestige account at Citibank, the government introduced some evidence indicating that both Prestige and Citibank existed. Government witness Robert Johnson testified to Prestige's existence, stating that he searched an Internet "Yellow Pages" site and found a company with the same name, but with an address different from the one on the counterfeit checks. Although Internet information often lacks authentication, *United States v. Jackson*, 208 F.3d 633, 637-38 (7th Cir. 2000), Johnson also testified that he located Prestige using "411." When discussing the scheme, Andre Lee also told Johnson that the checks came from "one of their friends that worked at a big company," which the jury could have inferred to mean Prestige.

Moreover, the government submitted considerable evidence of Citibank's existence. The government may prove a violation of § 513 "by showing that the banks which issued the check operated in interstate commerce (on the theory that the checks were securities of the banks)." *Barone*, 71 F.3d at 1446 n. 10. Blancas testified that after the checks were cashed, St. Paul stamped them with the teller number and the branch identification before forwarding them to Citibank and Standard, respectively, for payment. The checks were forwarded in the ordinary course of business, according both to Blancas' testimony and to the markings in multiple inks that confirmed the checks' passage through normal banking channels.

According to Blancas, the eleven counterfeit Citibank checks were returned to St. Paul unpaid and stamped

with the notations "returned unpaid—no account known" and "Citibank, N.A. 654 Proof." The checks were stamped on the front with the phrase "refer to maker." The checks themselves, which were admitted into evidence, corroborate this testimony. Blancas also testified to the common usage of these phrases in the industry: a bank will generally stamp a check with the term "refer to maker" to return a check as unpaid, and with the term "no account known" to indicate that it has no record of the account in bank records. After receiving these checks, Blancas called Citibank to discern why they had been returned. The jury credited Blancas' testimony, and we will not disturb its finding. *See United States v. George*, 363 F.3d 666, 675 (7th Cir. 2004) (holding that "credibility is an issue reserved for the finder of fact" in a sufficiency challenge to defendant's conviction under § 513(a)). The markings on the checks, along with Blancas' testimony, provided sufficient evidence for a rational jury to conclude that Citibank was an actual entity for purposes of the statute. *See United States v. Murphy*, 406 F.3d 857, 861-62 (7th Cir. 2005) (holding that the district court should reverse defendant's conviction only if "the record contains no evidence on which a rational jury could have returned a guilty verdict").

Similarly, this evidence was sufficient to support the jury's finding that Citibank affected interstate commerce. All federally-insured banks operate in and affect interstate commerce. *See United States v. Watts*, 256 F.3d 630, 633 (7th Cir. 2001) (holding that "FDIC-insured financial institutions are instrumentalities and channels of interstate commerce"); *see also United States v. Spinello*, 265 F.3d 150 (3d Cir. 2001). Blancas testified that the victim bank, St. Paul, was FDIC-insured, and that St. Paul forwarded the counterfeit checks to Citibank through normal banking channels. The check markings in multiple inks bolster this testimony. This Court has previously stated that, "[b]anks are generally considered vehicles through which interstate

commerce emanates, as banks conduct innumerable transactions with persons, companies, and banks in other states and countries." *United States v. Turner*, 301 F.3d 541, 544 (7th Cir. 2002). It was reasonable for the jury to infer that Citibank, doing business with an FDIC-insured bank and sending instruments via normal banking channels in the ordinary course of business, was an organization that operated in interstate commerce.

### 2.  Counts Two and Three

These counts involved the five checks drawn on the Urban account at Standard. At trial, only Andre Lee was convicted on these counts; the jury acquitted Theodore Lee of Counts Two and Three. As to these counts, the government introduced no evidence to establish the existence of the account holder, Urban. Thus, its success on the "organization" element of these two counts rested on its proof of Standard's existence. *See Kellum*, 199 Fed. Appx. at 34.

Blancas' testimony was, in all relevant respects, the same for Standard as it was for Citibank. All five checks were returned with the stamped notation "refer to maker," which Blancas explained is commonly used by banks to indicate that they are returning an item unpaid. The notations on the five checks, all of which were introduced into evidence, comport with Blancas' testimony. When the checks were returned, Blancas contacted Standard to question them. From this evidence, the jury could have reasonably inferred that Standard existed. *See id.*

As for the drawee bank's effect on interstate commerce, the evidence described above in reference to Citibank applies equally to Standard. Further, Standard's name reinforces the jury's conclusion. "When the word 'Federal' appears in a bank's name, the implication is that the bank is a financial frigate navigating channels of nation-wide commerce." *United States v. Leslie*, 103 F.3d 1093,

1102 (2d Cir. 1997). The fact that Standard, the bank on which the checks were drawn, was referred to as a "Federal" savings institution supports the jury's reasonable conclusion that the checks were of an organization that had, "at least, a *de minimis* effect on interstate commerce." *Id.*

### 3. Counts Six and Seven

These counts involved the checks drawn on the Slager account at the Bank of Waukegan. As above, because the government introduced no evidence of the payor company's existence, it needed to establish that the drawee bank was an "organization" under the statute. The government, however, introduced no evidence of the Bank of Waukegan's existence. Blancas did not mention the bank in her testimony, probably because the check that Johnson cashed was part of the undercover Secret Service operation instead of her St. Paul investigation. On appeal, the government concedes that no evidence established the Bank of Waukegan's existence, but argues instead that the jury could have reasonably inferred its existence from the proven existence of Citibank and Standard, together with the defendants' pattern of cashing counterfeit checks drawn on actual banks. This argument is without merit—no jury could reasonably infer one bank's existence from evidence of the existence of other, unrelated banks. Because the government introduced no evidence to prove that the Bank of Waukegan was a "legal entity . . . which operates in or the activities of which affect interstate commerce," no rational jury could have found guilt beyond a reasonable doubt. As a result, we must reverse the convictions of both defendants on these two counts. *See United States v. Hach*, 162 F.3d 937, 942 (7th Cir. 1998) ("Only if the record is devoid of evidence from which a jury could find guilt will we reverse" (citing *United States v. Pulido*, 69 F.3d 192, 205-06 (7th Cir. 1995)).

**B. Interstate Commerce Instruction**

The defendants argue that none of the instructions submitted to the jury sufficiently set forth the government's burden on the interstate commerce element of the offense. The district court's decision not to instruct the jury on a theory of defense is reviewed *de novo*. *United States v. Buchmeier*, 255 F.3d 415, 426 (7th Cir. 2001). The district court is afforded substantial discretion with respect to the precise wording of instructions so long as the final result, read as a whole, completely and correctly states the law. *United States v. Tingle*, 183 F.3d 719, 729 (7th Cir. 1999). In this case, the court refused the defendants' tendered instruction, which read as follows:

> In order to sustain any of the charges as contained in the indictment, alleging conspiracy to make, utter and possess counterfeit securities and uttering and possessing counterfeit checks, the government must prove beyond a reasonable doubt that each of the organizations identified as the payor or issuing companies on the checks operated in or that the activities of these companies affected interstate commerce.

Defendants also objected to the government's elements instruction on the ground that it did not contain the interstate commerce element of the offense. The court overruled this objection, and dismissed the argument again when defendants raised the same issue in their motion for a new trial.

In denying the defendants' motion for a new trial, the district court held that the interstate commerce element of the offense was adequately covered by the given instruction because it defined the term "organization." Indeed, the court plainly instructed the jury on the meaning of the word "organization":

> The term "organization" means a legal entity, other than a government, established or organized for any

purpose, and includes a corporation, company, association, firm, partnership [sic] joint stock company, foundation, institution, society, union, or any other association of persons which operates in or the activities of which affect interstate commerce.

The language in the approved instruction almost exactly matches the definition of the term "organization" in 18 U.S.C. § 153(c)(4). Because the court properly defined the term to the jury and expressly stated that "the Government must prove . . . that the defendant uttered or possessed a counterfeit and forged security of an organization," it properly apprised the jury of the government's burden to prove this element of the offense. When read as a whole, the instructions fairly and accurately stated the law. *See Tingle*, 183 F.3d at 729. As a result, the district court committed no error.

## III.  Conclusion

For the foregoing reasons, we REVERSE the defendants' convictions on Counts Six and Seven, and AFFIRM their convictions on all other counts. Since the sentences on these two counts were concurrent with the sentences imposed for the other counts, there is no need to remand.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*