In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-2209 & 05-2591

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ABDUL KARIM ALHALABI,

*Defendant-Appellant*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 971—**Matthew F. Kennelly**, *Judge.*

ARGUED NOVEMBER 29, 2005—DECIDED APRIL 11, 2006

Before MANION, WILLIAMS, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Abdul Alhalabi owned a grocery store in Chicago. Most of the store's income came from transactions with customers using food stamps. The government started investigating Alhalabi after his store reported unusually large food stamp benefit redemptions. Through its efforts, the government determined that Alhalabi was illegally paying his customers cash for their benefits in an amount well below their face value. The government revoked Alhalabi's participation in the food stamp program but did not bring charges for wire and food stamp fraud until nearly five years later. After a five-day trial, a jury

convicted Alhalabi on three counts of wire fraud and three counts of food stamp fraud, and he was sentenced to forty-one months' imprisonment. Alhalabi appeals his conviction. We affirm.

## I.

Holyland Foods, Inc. ("Holyland"), a Chicago grocery store owned by Abdul Alhalabi, began participating in the federal food stamp program in 1993. While the United States Department of Agriculture ("USDA") provides food stamp benefits, the Illinois Department of Human Services administers the program in Illinois. The food stamp program allows eligible recipients to use vouchers to buy certain types of staple food, such as grains, meat, dairy, and poultry, from authorized stores. The owners of authorized stores must go through an application process and training, during which they learn that they are forbidden from trading food stamps for cash. After training, the USDA sends an investigator to conduct an inspection of the store and then decides whether to authorize that store.

Holyland's applications to the USDA detailed Holyland's operation. In the initial 1993 application, Alhalabi, identified as the president of Holyland, stated that the store had one cash register and no optical scanners. The application further stated that the store was stocked with household supplies and a range of foods including breads, dairy, fresh produce, poultry, fish, meat, and eggs. He estimated that Holyland would have annual gross sales of $240,000 and that approximately $190,000 of this amount would come from food sales. After a store inspection, Holyland received its authorization in November 1993.

In 1996, Alhalabi applied for reauthorization of Holyland's participation in the program. Alhalabi still listed himself as the president, though the gross sales (for the 1995 tax year) had increased to $367,000, with eligible food sales accounting for $300,000 of the total. Alhalabi indicated that in 1995 Holyland had accepted $280,000 worth of food stamps. Holyland was reauthorized in December 1996.

In 1997, the food stamp program in Illinois underwent a major change, replacing the existing regime in which paper food stamp coupons were used to obtain food. In its place, Illinois adopted an electronic system in which each person eligible for food stamp benefits had an individual account to which benefits were added once a month. The electronic system, which was named the LINK system, made use of a plastic card (the "LINK card"), similar to an ATM card, which was swiped at a point of sale device (the "POS") in an authorized store. The food stamp recipient would then enter a PIN code, and the amount of the sale would be deducted from his account balance. The LINK card also could be used to obtain cash if the card owner participated in the Illinois cash assistance program, which is not related to food stamps. Because this appeal centers on the technicalities of the LINK system and how it relates to the elements of the crime, a detailed description of the operation is helpful.

After a recipient used his LINK card, a retailer received payment through an entirely automated process. For the years 1997 and 1998, Illinois contracted with a company named Transactive, based in Austin, Texas, to administer these payments to retailers. Transactive, in turn, used services provided by National City Bank in this operation. National City offered a type of electronic funds transfer, the automated clearing house ("ACH") program. This computer

program compiled the daily LINK card transactions at
Transactive, and sent the data to National City, which
automatically transmitted payment to the appropriate
retailer bank accounts using the Federal Reserve system.

Examining the ACH process in greater detail, the program
involved Transactive computers automatically bundling all
the information received from Illinois LINK card transac-
tions into an ACH file. The ACH file was created on a daily
basis (at 2 p.m.) and included the amounts of all LINK
transactions in Illinois for each authorized location's
preceding business day. As Transactive received all LINK
transactions, the file could contain amounts of both food
stamp transactions and Illinois cash assistance. The file also
included the bank information for both Transactive and the
authorized retailers that were to receive payment. Once the
ACH file had been created for a day, Transactive's comput-
ers automatically transmitted the information to its concen-
trator bank, National City, which was located in Kalamazoo,
Michigan.

The ACH file received by National City contained infor-
mation on multiple retailers—whichever stores had LINK
transactions during their preceding business day. National
City's ACH computer program then sorted the retailers into
those which had bank accounts with National City and
those that did not. For those with bank accounts outside
National City, the ACH program transmitted payments to
each retailer according to the dictates of the National
Automated Clearinghouse Association. Basically, this meant
that the ACH program forwarded each store's account
information to the Federal Reserve computer system, which
automatically determined the tracking/ routing number of
the retailer's bank account and then sent the transaction
information to the retailer's bank. The end result was that

the retailer's bank posted the amount of the transaction. In other words, the retailer was paid. This process utilized no human interaction after the swipe of the LINK card and the entering of the PIN number, relying instead on computers for the interstate routing and transmission of funds.[1] In other words, once the LINK card was swiped at the site of the retail transaction, it set off a chain reaction of the events described above that ended with a deposit in the retailer's bank account.

Holyland, like other participating Illinois stores, switched from paper food stamps to the LINK system in 1997. Holyland's annual food stamp redemptions in the three years prior to this change were relatively constant: $137,723 in 1994; $201,457 in 1995; and $216,181 in 1996. The food stamp redemptions jumped significantly, however, once Illinois made the switch to the LINK system. In 1997, Holyland redeemed a total of $1,028,015 in food stamp benefits. Beginning in May of that year, the monthly food stamp redemptions shot up from $22,285 to approximately $184,000 in October. The pattern of increased activity continued unabated in 1998, during which time Holyland accepted a total of $1,032,778.26 through the first half of October. The LINK card transaction records from Holyland reflect that, during 1997 and 1998, Holyland repeatedly processed multiple, large food stamp transactions within mere seconds of each other despite its lack of multiple cash registers or optical scanners.

The jump in redemptions at Holyland did not pass unnoticed. The government suspected that Holyland was

---

[1] Transactive theoretically could have stopped a retailer payment by calling National City before the file was transmitted to the Federal Reserve.

trading cash for benefits. As mentioned previously, trading food stamp benefits for cash is illegal, but the incentive to cheat is high for both a store owner and a food stamp recipient. In a typical trade, the food stamp recipient accepts cash, albeit a discounted amount, in exchange for the ability to spend the proceeds without restriction. For example, a store owner might agree to give a recipient $50 cash for $100 in benefits. This gives the recipient cash to use on anything (instead of staple foods), while the store owner gets reimbursed from the government for significantly more than his actual outlay.

Acting on its suspicions, the government began an investigation, sending in multiple undercover agents to try to exchange food stamp benefits for cash. The first undercover agent posed as a welfare recipient in March 1998, but the cashier at Holyland refused to trade cash for benefits. This reluctance was short-lived, as a Holyland cashier began trading cash for benefits with a second undercover agent, Mireille Swain, in April. Swain received $80 cash for $125 in benefits on April 3 and $100 cash for $150 in benefits on April 8, as well as conducting other trades later that month. The investigation eventually culminated in the government's removal of Holyland's POS device on October 10, 1998. Alhalabi claimed that the increase in food stamp redemptions was the result of high meat sales from Holyland's meat counter and the closing of a nearby supermarket.

After the seizure of Holyland's POS device, the government left the case dormant for nearly five years. On October 8, 2003, the grand jury returned a six-count wire fraud and food stamp fraud indictment relating to payments to Alhalabi from October 8 to October 10, 1998, charging violations of 18 U.S.C. § 1343 and 7 U.S.C. § 2024(b). Before

and during trial, Alhalabi argued that the conduct charged in the indictment, which referenced the bank payments he received and not the swipes of the LINK cards, could not constitute food stamp or wire fraud under the language of each of the relevant statutes.[2] The district court at first reserved ruling on this issue.

At trial, the government called a number of witnesses, including Special Agent Swain, as well as a former employee who had traded cash for benefits, and various food stamp recipients who had traded benefits for cash. The government also introduced testimony from representatives of the USDA, Transactive, and National City, who explained how the ACH computer program worked from card swipe to final payment. After hearing from such representatives, the district court found that the indictment was sufficient. The jury convicted Alhalabi on all six counts, and he was sentenced to forty-one months in prison.

## II.

Alhalabi pursues challenges to his conviction in scattershot fashion. First, Alhalabi renews his contention that the indictment fails to charge any offenses. Alhalabi argues that the bank payments referenced in the indictment do not suffice to show food stamp fraud as defined by

---

[2] Alhalabi's argument was rooted in the fact that the government did not charge the actual swipes of the LINK card in the indictment. These swipes, as noted before, occurred on October 7-9, 1998. Had the government charged the swipes, it likely would have violated the five-year statute of limitations, at least regarding the October 7 swipe, as the grand jury did not return the indictment until October 8, 2003.

the food stamp statute. He further contends that the wire fraud counts in the indictment are insufficient. Building off of this theory, Alhalabi asserts that the jury instructions regarding the various counts, as well as the eventual verdict, were fundamentally flawed because of these defects. Next, Alhalabi argues that the district court erred by granting the government's motion to strike surplusage on the wire fraud counts. Alhalabi also suggests that the district court constructively amended the indictment through a number of its actions, including the admission of evidence of some LINK transactions from outside the period of the indictment and the motion to strike surplusage. Finally, he claims that the district court erred in admitting (and denying his motion to strike) certain evidence of fraudulent LINK transactions outside the period charged in the indictment.

### A.

#### 1.

As an initial point, Alhalabi opposes the indictment on the grounds that it failed to properly charge either wire or food stamp fraud. We review a district court's denial of a motion to dismiss an indictment de novo. *See United States v. Wilson*, 437 F.3d 616, 619 (7th Cir. 2006). While an indictment must allege the elements of an offense to be valid, it is not necessary to spell out each element if each is present in context. *See United States v. Westmoreland*, 240 F.3d 618, 633 (7th Cir. 2003). "The test for determining the sufficiency of the indictment is whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial." *Id*. (quoting *United States v. Garcia-Geronimo*, 663 F.2d 738, 743 (7th Cir. 1981)).

We first address Alhalabi's belief that the indictment failed to charge wire fraud. Alhalabi did not develop this argument in his initial brief before this court, raising it in a meaningful way only in his reply brief, so it is waived. *See Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005) ("The argument is more developed in [the] reply brief, but this is too little, too late, for 'arguments raised for the first time in a reply brief are [also] waived.'"); *see also United States v. Williams*, 436 F.3d 767, 769 (7th Cir. 2006); *United States v. Stevens*, 380 F.3d 1021, 1024-25 (7th Cir. 2004). Even if this argument were not waived, Alhalabi's theory would still fail. "To secure an indictment for mail or wire fraud, the government was required to show probable cause to believe that the defendant: (i) participated in a scheme to defraud; (ii) acted with intent to defraud; and (iii) used the mail or wires in furtherance of the fraudulent scheme." *United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005); 18 U.S.C. § 1343. Here, the allegations in the indictment set forth all three elements, explaining the fraudulent scheme and describing wires that brought Alhalabi his final ill-gotten gains. The district court correctly denied Alhalabi's motion to dismiss the indictment on the mail fraud counts.

Moving to Alhalabi's challenge to the food stamp fraud counts, Alhalabi relies on a narrow reading of the food stamp statute, which provides that "whoever knowingly uses, transfers, acquires, alters, or possesses coupons, authorization cards, or access devices in any manner contrary to this chapter" is guilty of a felony. 7 U.S.C. § 2024(b). Although we have in the past used this section to punish store owners who, like Alhalabi, traded cash for paper coupons, *see United States v. Barnes*, 117 F.3d 328 (7th Cir. 1997), Alhalabi claims a distinction between payments into a bank account as a result of food stamp fraud (as included in this indictment) and food stamp coupons (as

defined by the statute). Alhalabi contends that the food
stamp statute does not punish what was charged in this
indictment. As in the trial court, Alhalabi argues that a
swipe is all that is needed for food stamp fraud under the
LINK system. Under this reading, the statute of limitations
would disqualify the charges arising from the October 7
swipe.

Alhalabi's argument, however, lands wide of the mark.
The food stamp statute punishes the transfer and acquisition
of food stamp benefits, casting a broad net to include as
coupons both "electronic benefit transfer card[s]" as well as
"cash or check issued in lieu of a coupon." 7 U.S.C.
§ 2012(d). For each of three dates, the indictment states
that Alhalabi "did knowingly acquire, transfer, and
possess United States Department of Agriculture Elec-
tronic Transfer Card benefits, namely LINK benefits having
a value more than $100, . . . [and that] he knowingly and
unlawfully caused an electronic payment of [the rele-
vant amount for that date]" into his bank account. The
payments are simply the end manifestation of the food
stamp benefits—the same thing at a later stage. They are
part of one seamless transaction, and the indictment charges
that transaction. Alhalabi rails against considering these
payments as benefits, but he offers no compelling reason to
distinguish them. The LINK system simply combines the
various elements of the paper system— exchange of the
benefits, possession, and redemption—into one. We have no
difficulty in concluding that the indictment sufficed under
2024(b).[3]

---

[3] While we reject Alhalabi's argument, the government
could have avoided any issues had it not flirted dangerously

(continued...)

**2.**

Piggybacking off of this argument, Alhalabi challenges the district court's jury instructions relating to the food stamp fraud counts.[4] We review jury instructions de novo to determine whether they provide fair and accurate summaries of the law. *See United States v. Stewart*, 411 F.3d 825, 827 (7th Cir. 2005); *United States v. Tingle*, 183 F.3d 719, 729 (7th Cir. 1999). "Looking at the charge as a whole, we must determine whether the instruction misled the jury concerning the issues or its duty in relation to those issues." *See Tingle*, 183 F.3d at 729.

In relevant part, the district court instructed the jury that to convict Alhalabi, it had to find: "First, that the defendant knowingly acquired Link [sic] card benefits in a manner contrary to law and, second, that the amount

---

[3] (...continued)

close to the limitations deadline. This led to an awkward indictment that failed to charge the most conceptually accessible part of the transaction—when Holyland employees swiped the LINK cards and traded cash for the benefits. The cardholder got immediate cash, while the store owner had to wait. But the swipe set in motion a process that did not end until the money was in the bank. The government could charge at any point from swipe to deposit under the statute.

[4] Alhalabi mentions that the "wire fraud instructions were similarly erroneous" in his initial brief without any further argument. It is difficult to understand precisely what this cryptic reference means, given the vast difference between the elements of wire and food stamp fraud. Without necessary elaboration, this argument is waived. Even if it were not waived, the district court accurately instructed the members of the jury on what they needed to find for wire and food stamp fraud.

acquired exceed $100. . . . Under the law, Link [sic] card benefits may only be exchanged for eligible food and may not be exchanged for cash." As in his argument regarding the indictment, Alhalabi faults the district court for not distinguishing the bank payments from paper food stamp coupons. The district court, however, was correct to treat them as one transaction. The district offered an accurate summary of the law and properly directed the jury in its consideration of the issues.

**3.**

Alhalabi also contends that the district court erred in its denial of his motion for acquittal after the jury verdict on both the wire and food stamp fraud counts.[5] We review such a denial de novo, asking "whether the evidence presented, when viewed in the light most favorable to the government, could support any rational trier of fact's finding of all the essential elements of the crime beyond a reasonable doubt." *United States v. Brown*, 328 F.3d 352, 355 (7th Cir. 2003). We will reverse only if the record is devoid of evidence from which a jury could conclude guilt beyond a reasonable doubt. *See id*.

This challenge comprises the third in Alhalabi's trilogy of objections to the charged conduct. In this recitation, he argues that, as the bank payment wires that were charged did not constitute illegal offenses, the jury could not have properly convicted him. Alhalabi again is mistaken;

---

[5] Alhalabi also raises a sufficiency of the evidence challenge to the verdicts. As the later challenge proceeds along precisely the same track as his challenge to the denial of the motion for acquittal, we need not address it separately.

the government put forward sufficient evidence on both the wire and food stamp fraud counts to secure a conviction. A Holyland employee testified that he traded cash for benefits from the LINK card and food stamp recipients confirmed that Holyland paid them for such benefits. The government introduced testimony from the USDA, Transactive, and National City to explain how the swipe of the LINK card automatically results in the transfer of benefits to a retailer file and eventually payment into a retailer's bank account. Confirming the testimony of the Transactive employee, the government introduced evidence of both the relevant LINK card swipes and the eventual payment into Alhalabi's account of the amounts of the food stamp benefits. The jury had reasonable evidence from which it could conclude that Alhalabi was guilty beyond a reasonable doubt on each count.

## B.

Next, Alhalabi argues that the district court erred in granting the government's motion to strike the various amounts referenced in the food stamp fraud counts. An amendment or change to an indictment will be "allowed to stand if it does not change an 'essential' or 'material' element of the charge so as to cause prejudice to the defendant." *United States v. Cina*, 699 F.2d 853, 857 (7th Cir. 1983). A material element of the crime is one whose specification with precise accuracy is necessary to establish the illegality of the behavior and the court's jurisdiction. *See id.*; *see also United States v. Clark*, 943 F.2d 775, 783 (7th Cir. 1991); *United States v. Muhammad*, 928 F.2d 1461, 1470 (7th Cir. 1991).

The exact amounts of the payments were not material elements of the charges. The government charged Alhalabi

with fraudulently obtaining food stamp benefits, which resulted in the automatic payment into his bank account of certain sums several days later. The exact sums listed in the indictment were not necessary to these charges. What mattered was that he illegally possessed food stamp benefits (for which he received payment), not the inner workings of the payment system. Alhalabi does not contend that these wires reimbursed him for something other than the swipes of the LINK cards several days earlier or were less than one hundred dollars. His challenge on this ground, therefore, fails.

## C.

Alhalabi further asserts that several of the district court's actions amounted to a constructive amendment of the indictment. Combining several of his prior arguments, Alhalabi finds fault in: (1) the presentation of evidence about wires not charged in the indictment; (2) testimony about uncharged food stamp fraud; (3) the introduction of the payments into his bank account, which he contends could not be considered food stamp benefits; and (4) improper jury instructions. We review whether a district court constructively amended the indictment de novo. *United States v. Trennell*, 290 F.3d 881, 886 (7th Cir. 2002); *see also United States v. Pigee*, 197 F.3d 879, 885 (7th Cir. 1999). "Constructive amendment of the indictment can occur 'when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury.'" *United States v. Jones*, 418 F.3d 726, 729 (7th Cir. 2005) (quoting *United States v. Cusimano*, 148 F.3d 824, 829 (7th Cir. 1998)). Constructive

amendments are forbidden as they violate the guarantees of the Fifth Amendment. *See United States v. Murphy*, 406 F.3d 857, 860 (7th Cir. 2005).

No constructive amendment occurred in this case. We briefly address each of Alhalabi's contentions, three of which we have already rejected and all of which we reject in this context. First, the government's presentation of wires not expressly mentioned before the grand jury did not affect the scope of the indictment. At trial, the government offered evidence about fraudulent food stamp transactions that directly resulted in payment to Alhalabi's bank account. The government simply supplied more technical details that easily fit with the allegations in the indictment. The introduction of the complete ACH system did not contradict or change in any substantive way what had been presented to the grand jury, and thus, was not a constructive amendment. *See Trennell*, 290 F.3d at 888.

Second, Alhalabi argues that the entry of evidence of conduct occurring prior to the crimes charged amended the indictment by allowing the jury to convict for uncharged acts, in particular the LINK swipes of October 7-9. The admission of evidence intricately related to the charged crimes (the remaining parts of the LINK system) does not constructively amend the indictment. *See, e.g.*, *United States v. Johnson*, 248 F.3d 655, 665 (7th Cir. 2001); *Cusimano*, 148 F.3d at 829. Here, the government presented evidence intricately related to the crimes charged to paint for the jury the complete picture of the scheme and Alhalabi's actions. This did not alter the crimes from the ones described in the indictment.

Third, Alhalabi contends that the payments into his bank account that were charged in the indictment did not constitute any crime and, therefore, the indictment must have

been *de facto* amended to support the verdict. As explained before, each count properly charged one transaction, not multiple transactions, in which Alhalabi possessed the electronic coupon benefits and which resulted in the payment of money into the bank account. This fully stated the crimes of food stamp fraud and wire fraud.

Fourth, Alhalabi asserted that, by omitting his narrow reading of food stamp benefits, the district court crafted improper jury instructions. However, the district court properly viewed this as a seamless transaction and delivered instructions that properly summarized the law. No error occurred.

### D.

Finally, we examine Alhalabi's claim that the district court erroneously admitted evidence of prior food stamp fraud outside the charged time period. Alhalabi filed both a motion in limine and a motion to strike such evidence, both of which the district court denied. Before this court, Alhalabi suggests that these rulings contravened Federal Rule of Evidence 403, as the unfair prejudicial impact outweighed the evidence's probative value. We review the district court's denials for an abuse of discretion. *See United States v. Griffin*, 194 F.3d 808, 822 (7th Cir. 1999) (denial of motion in limine); *United States v. Bucey*, 876 F.2d 1297, 1314-15 (7th Cir. 1989) (denial of motion to strike surplusage).

The district court acted properly. In the present case, the government introduced evidence of a long-running scheme by Holyland Foods to abuse the LINK card system by trading cash for benefits. The evidence explained, from the perspective of a store employee, food stamp program recipients, and undercover investigators, the ins and outs of

this fraud. This evidence had extremely high probative value. Looking at the other side of the Rule 403 ledger, there is nothing about this evidence that bears the hallmarks of unfair prejudice. *See United States v. Connelly*, 874 F.2d 412, 418 (7th Cir. 1989) ("Evidence is considered unfairly prejudicial, not merely because it damages the opposing party's case, but its admission makes it likely that the jury will be induced to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented on the crime charged.") (internal citations omitted). Alhalabi failed, in both his briefs and at oral argument, to introduce any compelling reason that would suggest the jury would be confused or "incited" to decide this case on an improper basis. We conclude, therefore, that the district court did not abuse its discretion when denying Alhalabi's various motions opposing the admission of this evidence.

### III.

Alhalabi engaged in food stamp and wire fraud on the dates alleged in the indictment, October 8-10, 1998. The indictment crafted by the government, while not ideal, was sufficient. The district court properly ruled on the various challenges to the indictment and evidentiary issues, and we, therefore, AFFIRM.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*